637 So.2d 753 (1994)
Johnny R. ROCHEL and Phyllis Rochel
v.
TERREBONNE PARISH SCHOOL BOARD, Johnny C. Storz, Jr. and Pelican State Mutual Insurance Co. and Allstate Insurance Co.
No. 93 CA 0383.
Court of Appeal of Louisiana, First Circuit.
May 20, 1994.
*755 Jerry L. Hermann, Houma, for plaintiffs-appellees Johnny R. and Phyllis Rochel.
Sidney W. Degan, III, Foster P. Nash, III, John F. Deas, Houma, for defendants-appellants Terrebonne Parish School Board, Johnny Storz & LIGA.
Kenneth Givens, Houma, for defendant-appellant Allstate Ins. Co.
Before LOTTINGER, C.J., and CRAIN and LeBLANC, JJ.
CRAIN, Judge.
The issues for review in this personal injury action are quantum and the liability of the Louisiana Insurance Guaranty Association (LIGA) for interest and court costs incurred before and after insolvency of the insurer. Liability was stipulated at trial.
Johnny R. Rochel was injured in a rearend collision on February 15, 1991. He was examined by Dr. Christopher E. Cenac, an orthopedist, on February 20, 1991. He presented at Dr. Cenac's office complaining of neck and back pain and of pain radiating into the left hip and leg. Dr. Cenac examined Rochel and ordered x-ray studies of the lumbar and cervical spine. Based on the examination and x-ray results, Dr. Cenac noted the presence of degenerative disc disease and spondylosis of the cervical and lumbosacral spine; degenerative spondylolisthesis at L5-S1; evidence of mechanical dysfunction with limitation of motion; muscle spasm; aggravation of symptoms with extension of the neck and back; and normal neurological function.
Despite a few months of conservative treatment Mr. Rochel's pain continued. Dr. Cenac ordered MRI studies of the neck and lower back and contrast enhanced cervical and lumbar myelography. The cervical MRI revealed a large central disc rupture between levels C5 and C6; a disc protrusion between C6 and C7 with other levels of cervical disc protrusion including 3-4 and 4-5 above the two levels of disc herniation; and foramina stenosis. "Foramina stenosis" was defined by Dr. Cenac as pressure upon the nerve root as it exits the spine. The lumbar MRI confirmed the spondylolisthesis defect at L5-S1; degeneration of the discs between L2, L3, L4, L5 and the sacrum; and disc protrusions at L4 and L5 with nerve root impingement and spinal cord compression. The contrast enhanced cervical and lumbar myelography confirmed the above enumerated findings in addition to cervical spondylosis and disc herniation at C5-6 and acquired spinal stenosis at C6-7. Mr. Rochel underwent a cervical disc excision and fusion at C5-6 on May 30, 1991.
Dr. Cenac concluded, and it is uncontested, that the spondylosis, spondylolisthesis, spinal stenosis and degenerative disc disease were conditions which pre-existed the accident. However, the accident aggravated the condition causing it to become symptomatic to the point that surgery was required to alleviate the condition. Further, the pre-existing condition caused Mr. Rochel to be more susceptible to back injury. It is further uncontested that the results of the surgery were excellent to very good. Mr. Rochel stated he suffers no cervical pain since the surgery. Dr. Cenac stated that although the results of the surgery were very good, after a fusion of a motion segment of the spine such as the fusion performed at C5-6
"that particular level becomes immobile or fused and tends to accelerate the degenerative processes above and below the operative site such that it is possible he could develop some accelerated changes of arthritic degeneration at those levels above and below. I can't tell you, however, that he will specifically accelerate those changes, I can't tell you if those changes are going to require surgical intervention or not, nor can I tell you at what time. But I have to tell you that it is a well known fact that he can have and should expect some accelerated degenerative changes above and below the fusion site. More probably than not. I would not expect it to be a surgical lesion. And that's based upon medical fact or knowledge.
. . . .
[I]t doesn't have anything to do with his symptomatology. I know that if I fuse C5-6 and you've already got arthritis above and below, I know it's going to get worse because 5-6 isn't moving. But I *756 can't tell you it's going to get so bad he's got to have surgery. And if you ask me if he has to have surgery when would that be, I can't tell you that either. But I have to tell you that I know it will accelerate it. To what extent, I can't tell you."
The anatomical impairment rating assigned to Rochel relating to the cervical condition is 10% to 15% of the whole body. The restrictions placed on him for future work in reference to the cervical spine are no lifting of weights in excess of 30 to 35 pounds; no overhead physical activity; and no repetitive stooping, squatting, twisting, kneeling, bending, climbing or working in unprotected heights.
At time of trial Mr. Rochel continued to experience low back symptoms. Dr. Cenac stated that Mr. Rochel is a candidate for surgery of the lumbar spine, i.e., a decompress sieve procedure along with bone grafting and fusion at the L4, L5 level and the sacrum. The indicators for these procedures are: documented pathology, persistent radicular complaints, motor and/or sensory deficits, numbness, weakness in the legs, inability to function without requiring controlled medications, and interference with activities of daily living because of pain. He stated that Mr. Rochel has experienced the majority of these indicators. The reason Dr. Cenac did not recommend lumbar surgery any earlier was that surgical treatment of the low back is more extensive with less successful results than surgery of the cervical spine.
He further stated that should Mr. Rochel choose to not have the lumbar surgery the anatomical impairment rating of the whole body would be 10% to 15% (in addition to that assigned for the cervical spine). Should he choose to undergo lumbar surgery, the resulting anatomical impairment rating of the whole body following such surgery would be 25% to 30% (in addition to that assigned for the cervical spine). The work restrictions applicable to Mr. Rochel relative to the lumbar condition either with or without surgery are: no lifting of objects weighing greater than 20 to 25 pounds and no prolonged sitting or standing without intermittent periods of rest. Dr. Cenac added that as a result of his condition, Mr. Rochel will have to be employed in light or sedentary occupations.
Dr. Cenac was queried regarding whether the pre-existing condition alone, without intervention of the accident, would have eventually deteriorated to the point where surgery would have been required to alleviate the condition. Dr. Cenac stated that the presence of the pre-existing condition
"does not mean it will develop to an extent which will require surgery. And there is no corollary.... [W]e treat the patients and not the x-rays.... So we don't operate on how bad the x-rays look, we operate on the symptoms of the patient. And just because you've got it that doesn't mean you have to have surgery and vice versa."

QUANTUM
At issue regarding quantum are the following sums awarded to Rochel: $125,000 for past, present, and future physical and mental pain and suffering for injury to the cervical spine; $150,000 for past present and future physical and mental pain and suffering for injury to the lumbar spine; $35,000 for future medical expenses; and $165,000 for future wage loss and loss of future earning capacity.

a.) General Damages

In the first and second assignments of error appellants contend that the record does not support general damage awards for the cervical and lumbar injuries suffered by Rochel.
The discretion vested in the trier of fact in assessing general damages is vast. Thus an appellate court should rarely disturb an award of general damages. Such an award should be modified "only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances...." Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert denied, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
A defendant is responsible for the natural and probable consequences of his tortious act, including the aggravation of a *757 pre-existing condition. The victim must be compensated for the full extent of the aggravation of the injury. Hurst v. Drusilla Seafood of Hammond, 616 So.2d 749 (La.App. 1st Cir.), writ denied, 623 So.2d 1337 (La. 1993). In reviewing the entire record including the oral reasons for judgment it is apparent that the trial judge was clearly favorably impressed with the credibility of Mr. Rochel regarding the extent of his physical and mental pain and suffering. Given the vast discretion of the trial court in assessing general damages, we find no abuse of discretion herein. This assignment is without merit.

b.) Future Medical Expenses

In the second assignment of error appellants additionally contend the award of $35,000 for medical expenses for anticipated future lumbar surgery should be set aside because it is more probable than not that Mr. Rochel will not undergo lumbar surgery. In support of this allegation appellants refer us to the testimony of defendants' expert, Dr. Del Walker, who they allege recommends conservative treatment, not surgery, for this lumbar condition. Appellants additionally cite Mr. Rochel's testimony in which he stated he does not want to undergo additional surgery.
In oral reasons for judgment the trial judge stated:
"I've gleaned from Mr. Rochel's testimony that he's a stoic individual. From his wife's testimony that he's not a complainer. I've listened to his symptoms and I know Mr. Rochel is fighting the surgery. Unlike.... I mean it would be very easy for him to come up here and say, `Okay, yes, well since my deposition was taken, I've decided I'm going to have the surgery in two weeks' and then, you know, I mean, then there would be no question. But Mr. Rochel's a straightforward honest man and he did not say that. He's fighting it but from his testimony, his wife's testimony and from Dr. Cenac and reading Dr. Walker's testimony, it strikes me that as much as he's going to fight it, he's going to have to succumb to the surgery. And I may be reversed on that point, because like I said, it's not crystal clear but I believe he's going to have the surgery."
We have carefully reviewed the record and find the award for future medical expenses was not an abuse of discretion and is supported by the evidence.

c.) Future Lost Wages and Earning Capacity

In the third assignment of error appellants contend the award for future lost wages and earning capacity is contrary to the evidence and clearly erroneous.
In 1988 Rochel was employed in the offshore oil industry as a welder, earning $38,512 for that year. He testified, and it is uncontested, that he left that employment for less lucrative employment as a maintenance man at numerous apartment complexes. He voluntarily quit offshore work in order to remain at home with his wife who was diagnosed with Charcot-Marie-Tooth disease, a disease which results in progressive neuropathic muscular atrophy. He earned $12,389.50 from June of 1990 through the end of the year.
The trial judge's award for future loss of income was based on the difference between the wages earned by Rochel as a handyman and the minimum wage jobs which would be available to Mr. Rochel based on the restrictions assigned to Rochel by Dr. Cenac. Plaintiffs' expert estimated the figure to be $160,000. Defendants' expert placed the figure at $100,000. The trial judge awarded the sum of $130,000. This award is supported by the evidence.
Defendants also allege the trial court's award of $35,000 for loss of future earning capacity was not supported by the evidence. This award was based on the trial judge's determination that although Rochel would probably have continued working as a handyman he still had the ability to return to the welding profession should he have chosen to do so. He may have chosen to do so in the future for financial reasons such as to be able to purchase a new vehicle. His physical condition eliminated that option.
A reviewing court should not set aside an award of special damages unless an *758 analysis of the facts and circumstances reveals an abuse of discretion in setting the award. Reck v. Stevens, 373 So.2d 498 (La. 1979). We find the award is supported by the record and is not an abuse of discretion.

INTEREST AND COURT COSTS
The accident occurred in February, 1991. The trial was held in March, 1992. Plaintiffs were awarded court costs and interest from date of judicial demand. On August 13, 1992, Pelican State Mutual Insurance Company (Pelican), defendants' insurer was placed in rehabilitation by order of the 19th Judicial District Court. Pelican was subsequently declared insolvent, thus in January, 1994 LIGA was substituted as a party defendant in its stead.
Although appellees were awarded court cost and interest from judicial demand, in brief they requested that we determine on appeal whether LIGA is responsible for post-insolvency interest and court costs. LIGA then briefed the issue in reply brief. We treat LIGA's briefing of the issue as an assignment of error. Consequently, this issue is properly before us.
In reply brief LIGA contends it is not responsible for either pre or post-insolvency interest and court costs. LIGA cites La.R.S. 22:1379(3)(d) and 13:4521(A) for this proposition. La.R.S. 22:1379(3)(d) excludes court costs, interest and other expenses which occurred before insolvency from the definition of a "covered claim" for which LIGA shall be responsible. This statute was amended by La.Acts 1990, No. 105, sec. 1. Its effective date was September 7, 1990. It was effective before the time of the accident. See Gautro v. Fidelity Fire and Casualty Insurance Co., 623 So.2d 106 (La.App. 1st Cir.), writ denied, 629 So.2d 413 (La.1993). Thus interest and court costs accruing before Pelican's insolvency are excluded from coverage by LIGA.
Pursuant to La.R.S. 13:4521(A) as amended by La.Acts 1993, No. 651, sec. 1, LIGA was included in the enumerated public entities which are absolved from the payment of court costs in any judicial proceeding prosecuted by or against these entities. A defendant insured generally has a contractual right to expect the payment of interest and court costs from its insurer for any claim against either the insured and/or the insurer. See Gautro v. Fidelity, 623 So.2d at 109. At the time of the accident the insured had this contractual right. Thus the 1993 amendment constitutes a substantive change which abolished a right of an insured/claimant and should be applied prospectively only.
Accordingly, we affirm the amount of damages awarded. Total court costs including cost of appeal are $2,794.55. We amend the judgment to reflect that interest and court costs accruing prior to August 13, 1992 are to be assessed to Johnny Storz, Jr. and the Terrebonne Parish School Board. Court cost and interest accruing after August 13, 1992 are assessed to Johnny Storz, Jr., Terrebonne Parish School Board and LIGA.
AMENDED AND AFFIRMED.