738 So.2d 724 (1999)
Ginger A. SHOWS
v.
SHONEY'S, INC., Shoney's Inn, Rhonda McDurmmond and Northbrook Property and Casualty.
No. 98 CA 1254.
Court of Appeal of Louisiana, First Circuit.
July 29, 1999.
*727 Bryan D. Fisher, Frank Tomeny, III, George K. Anding, Jr., Baton Rouge, for Plaintiff-Appellant Ginger A. Shows.
Dominic J. Gianna, New Orleans, trial attorney for defendants Shoney's, Inc., Rhonda McDurmmond, and Northbrook Property and Casualty Insurance Co.
Clare W. Trinchard, Leigh Ann Schell, Trinchard & Trinchard, New Orleans, appellate counsel for defendant-appellants, Shoney's, Inc., Rhonda McDurmmond, and Northbrook Property and Casualty Insurance Co.
Lindsey J. Leavoy, Baton Rouge, for Intervenor-Appellee Audubon Indemnity Company.
Jack M. Alltmont, New Orleans, for United National Insurance Company, Amicus Curiae.
Before: FITZSIMMONS, GUIDRY, and PETTIGREW, JJ.
PETTIGREW, J.
The instant suit was filed by Dr. Ginger A. Shows to recover damages for injuries she sustained as a result of a fall in a Shoney's restaurant. Following a bench trial, judgment in the amount of $7,790,380.00 was rendered in favor of Dr. Shows. All parties have appealed from this judgment. For the following reasons, we reverse in part, amend, and as amended, affirm.

FACTS AND PROCEDURAL HISTORY
On October 1, 1988, Dr. Ginger A. Shows was a patron at a Shoney's restaurant located in East Baton Rouge Parish. Dr. Shows, a 33-year-old practicing cardiologist and board-certified internist, was walking from the breakfast bar towards the booth where her companions were sitting when her right foot "hit or touched an area on the floor which was slick" causing her to fall on her tailbone. According to Dr. Shows, she immediately felt a "terrific searing pain" in her right hip area. She was helped to her feet by two other patrons of the restaurant and remained at Shoney's for approximately 35 to 40 minutes to finish her breakfast. Dr. Shows then went home and took Advil for the pain in her back and hip area. Dr. Shows indicated that because she was "really hurting," she decided to drive herself to the emergency room at the Medical Center of Baton Rouge. Dr. Shows underwent x-rays and was given a prescription for pain medication. She was diagnosed as having sustained a fractured or dislocated coccyx, or tailbone.[1]
Dr. Shows filed a petition for damages on September 25, 1989, to recover damages for the injuries sustained in the Shoney's fall. Named as defendants were Shoney's, Inc., Shoney's Inn, Rhonda McDurmmond, the manager of the restaurant where the incident occurred, and Northbrook Property & Casualty, the liability insurer of Shoney's, Inc.[2]
The matter proceeded to a bench trial on February 10-12, 1998, at which time Shoney's stipulated to liability. After hearing the evidence, the trial court rendered judgment in favor of Dr. Shows in *728 the amount of "$7,790,380.00, together with legal interest thereon from date of judicial demand until paid." The trial court signed a judgment on February 19, 1998, awarding the following damages:

Physical Pain and Suffering,
Past, Present, and
Future: $ 175,000.00
Mental and Emotional Pain and
Suffering, Past, Present and
Future: $ 125,000.00
Medical Expenses, Past and
Future: $ 75,000.00
Past Lost Earnings: $2,152,209.00
Future Lost Earnings: $5,263,171.00

Dr. Shows appealed this judgment asserting that the trial court erred in its award of general and special damages, in that the "awards were below what a reasonable trier of fact should have assessed for the effects of this injury to plaintiff, under the particular circumstances of this case."
In answering Dr. Shows' appeal, Shoney's alleged the following assignments of error:
1. The $300,000.00 general damage award made to plaintiff should not be increased. Instead, the award should be reduced since most of plaintiff's ailments are wholly unrelated to the accident.
2. Because the trial court's award for medical expenses and future medical expenses is not supported by the record, it should be reduced.
3. The award for lost earning capacity should not be increased. Rather, the award should be vacated based on the trial court's inappropriate exclusion of expert testimony. Alternatively, the award should be reduced to comply with the concrete financial information contained in the record.
Shoney's also separately appealed the trial court's judgment assigning the following specifications of error:
1. The trial court committed manifest error in refusing to grant the defendants a mandatory continuance of the trial where the defendants were unable, despite exercise of due diligence, to obtain a meaningful IME and were unable to obtain documents needed to defend plaintiff's claim for lost wages and lost earning capacity.
2. The trial judge abused her discretion in striking the defendants' economic experts where they were timely identified, plaintiff delayed in producing economic evidence, and plaintiff had ample opportunity to prepare for defendants' proposed witnesses. Likewise, the trial court erred in severely limiting defendants' presentation of a medical defense by limiting defendants to only one medical expert where plaintiff suffered from a plethora of medical ailments and was recovering from unrelated, major surgery at the time of her IME.
3. The trial judge erred in striking the jury such that the judgment should be vacated. Alternatively, if the case is remanded, it should proceed before a jury.
4. The trial judge committed manifest error in concluding that plaintiff was severely disabled as a result of the accident at issue where medical testimony unequivocally revealed that plaintiff suffered from numerous, severe ailments which were not caused by the accident.
5. The trial court's award for lost earnings and lost earning capacity should be vacated since the fact-finding process was tainted by the court's prejudicial exclusion of defendants' expert economic witnesses and is based on the speculative testimony of an economist which is inconsistent with the concrete financial information in the record.
Because of the convoluted nature of these appeals, we find it necessary to separate this opinion into two sections. We will first address the assignments of error set forth by Shoney's in its appeal of the trial court judgment. We will then discuss the issues set forth in Dr. Shows' appeal, *729 including Shoney's specifications of error in its answer to the appeal.
We further note that United National Insurance Company ("United"), a non-party, filed an amicus curiae brief arguing that because the award for future lost wages bears legal interest from the date of judicial demand, the award should be discounted to present value as of the date of judicial demand. This is a new issue that was not addressed in the briefs of the parties that are currently before this court. The law is well settled that issues not raised by the litigants cannot be raised by amicus curiae on appeal. Banker's Insurance Company v. Kemp, 96-0469, p. 6 (La.App. 1 Cir. 12/20/96), 686 So.2d 111, 114. Thus, we decline to reach this issue, raised for the first time in this court by a non-party.[3]

I. SHONEY'S APPEAL

Denial of Motion to Continue Trial
Shoney's filed a motion to continue the trial of this matter, claiming that they had been unable to obtain material evidence crucial to its defense of Dr. Shows' claim for economic damages. Shoney's argued that "[d]espite [its] persistent efforts to conclude discovery in this matter, [Dr. Shows] has needlessly been uncooperative and either not responded at all to discovery, inadequately responded, or delayed providing responses altogether." According to Shoney's, Dr. Show's actions "irreparably damaged" its ability to defend itself and constituted peremptory grounds for a continuance as set forth in La.Code Civ. P. art. 1602. Pursuant to Article 1602, "[a] continuance shall be granted if at the time a case is to be tried, the party applying for the continuance shows that he has been unable, with the exercise of due diligence, to obtain evidence material to his case." At a hearing on January 14, 1998, the motion for continuance was denied by the trial court.
In response to Shoney's allegations regarding this issue, Dr. Shows asserts that "while defendants certainly did not exercise due diligence, they were nevertheless successful in obtaining the evidence they sought prior to trial." Dr. Shows further alleges that it was Shoney's "failure ... to adhere to the discovery deadline" set by the trial court and "to make timely and judicious use of the discovery system" that resulted in Shoney's purported inability to defend against her claims. Following our review of the record, we agree with Dr. Shows' argument in this respect.
According to the record, Dr. Shows stated in her petition for damages, as well as in the pre-trial order, that she sustained a severe and disabling injury entitling her to loss of earning capacity. Furthermore, in January of 1996, James Ramsey and Dr. Randolph Rice were named as experts regarding Dr. Shows' economic claims. Despite being notified of these potential expert witnesses two years prior to the trial of this matter, it was not until November 26, 1996, that Shoney's requested discovery regarding the reports prepared by these witnesses. The record clearly demonstrated that the series of events that followed, and allegedly resulted in Shoney's *730 inability to defend against Dr. Shows' claims for economic losses, was caused by Shoney's dilatory tactics. Despite the tardiness of Shoney's actions, on January 14, 1998, the trial court ordered that Dr. Shows submit to an IME and ordered Dr. Shows to produce various financial records regarding her cardiology practice.
As noted by Dr. Shows in brief, Shoney's was well aware of the nature of the claims pending against it and had eight years to conduct discovery and obtain a "meaningful IME." Shoney's ultimately obtained the necessary evidence and was allowed to conduct an IME of Dr. Shows. Based on our review of the record, we conclude that Shoney's failure to obtain the evidence sooner was not Dr. Shows' fault. Because Shoney's did not "exercise due diligence" in obtaining this material evidence, a mandatory continuance was not warranted in this case. See La.Code Civ. P. art. 1602. Furthermore, as we find no abuse of discretion by the trial court in denying Shoney's motion to continue, the trial court's ruling on this matter will not be disturbed. See Willey v. Roberts, 95-1037, p. 3 (La.App. 1 Cir. 12/15/95), 664 So.2d 1371, 1374, writ denied, 96-0164 (La.3/15/96), 669 So.2d 422. This assignment of error is without merit.

Striking of Shoney's Expert Witnesses and Limitation of Shoney's Medical Defense
In assignment of error number two, Shoney's asserts that the trial court erred in striking the seven expert witnesses that it named in a supplemental response to Dr. Shows' discovery. Shoney's also complains that the trial court erred in limiting its medical defense to only one medical expert. Responding to this assignment of error, Dr. Shows alleges that any supplemental responses to discovery, including the identification of witnesses, were due by the December 10, 1997 deadline previously set by the trial court as a "discovery cutoff" date. As Shoney's supplemental response listing the seven expert witnesses was not provided until January 9, 1998, Dr. Shows submits "that the trial court was well within her great discretion" in refusing to allow the addition of all seven of the witnesses. We agree.
Pursuant to La.Code Civ. P. art. 1428, a party is required to seasonably supplement his response to discovery with respect to any question directly addressed to "the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony." Article 1428 further provides that "[a] duty to supplement responses may be imposed by order of the court." The trial court's Case Management Schedule in the instant case constitutes just such an order. The court set a discovery cutoff date of December 10, 1997.
According to the record, in 1991, Dr. Shows requested information from Shoney's regarding the expert witnesses who were expected to testify at trial. Shoney's knew about Dr. Shows' claim for economic losses in 1996, possibly as early as January 1996, and at the latest by November 1996. Shoney's had ample opportunity to develop its medical defense and sufficient time to supplement its responses to Dr. Shows' discovery request regarding expert witnesses prior to the December 10, 1997 deadline. Despite Shoney's failure to timely name its expert witnesses, the trial court did order that Dr. Shows submit to a last-minute IME at LSU Medical Center. Furthermore, the court allowed one of Shoney's expert witnesses to testify at trial regarding the IME. Thus, contrary to what Shoney's now argues, it was not prejudiced by the trial court's decision to strike the other six expert witnesses.
We also note that Shoney's was well aware of the court's position on this issue prior to filing the supplemental discovery response on January 9, 1998. On December *731 15, 1997,[4] at a scheduled hearing on a Motion for Protective Order filed by Dr. Shows, counsel for Dr. Shows voiced his opinion regarding Shoney's "eleventh hour" attempt to add experts and require Dr. Shows to submit to an IME. After being notified of Shoney's plans in this respect, the trial court responded, "Well, that's a problem because the discovery cutoff date which I set is December 10th." This assignment of error lacks merit.

Striking of Shoney's Request for a Jury Trial
Shoney's argues in brief that the trial court erred in striking its request for a jury trial. Dr. Shows directs our attention to the previous decision of this court wherein a supervisory writ filed by Shoney's on this very issue was denied, with reasons. Dr. Shows argues that this court's prior disposition of this issue has become the "law of the case," thereby foreclosing relitigation of the issue in this appeal. We agree.
In Trans Louisiana Gas Company v. Louisiana Insurance Guaranty Association, 96-1477 (La.App. 1 Cir. 5/9/97), 693 So.2d 893, this court summarized the "law of the case" doctrine as it is applied in Louisiana.
The "law of the case" doctrine is a court practice usually applied at the appellate level in regard to parties who have had the identical issue presented and decided previously by that appellate court in an earlier appellate proceeding in the same case. The principle is applicable to and determines the effect given prior rulings disposing of identical issues in the same proceeding involving the same parties. The law of the case doctrine avoids indefinite relitigation of the same issue, obtains consistent results in the same case, affords one opportunity for argument and decision, and provides fairness to the parties involved. The doctrine is discretionary and should not be applied where it would effectuate an obvious injustice or where the former appellate decision was clearly erroneous.
Trans Louisiana Gas Company, 96-1477 at 5-6, 693 So.2d at 896 (citations omitted).
Our review of the record in the instant case reveals that the trial court's Case Management Schedule provides as follows with regard to the posting of a jury bond:
Jury bond in the amount of $4,000.00 is to be filed no later than 45 days prior to trial by the requesting party and no later than 35 days prior to trial by the non-requesting party, with a true or certified copy of the bond to be delivered by the filing party to the Jury System Coordinator (Room 702) on the date filed.
Shoney's, the party who originally requested a trial by jury, did not post a jury bond until January 6, 1998, approximately 10 days after the deadline set by the trial court had passed. Dr. Shows moved to strike the jury on the basis that Shoney's had posted the jury bond in an untimely manner. The motion was granted by the trial court, and Shoney's applied for supervisory writs in this court. In denying the application, this court noted, "[t]he relators failed to timely file the jury bond, which was to be filed `no later than 45 days prior to trial'. Therefore, the trial court correctly struck the jury trial." Shoney's then applied for supervisory and/or remedial writs with the Louisiana Supreme Court. This writ application was also denied.
After thoroughly reviewing the record and this court's prior decision, we conclude that the "law of the case" doctrine is applicable. Application of the doctrine does not effectuate an injustice, nor is this court's *732 prior decision clearly wrong. As such, this assignment of error is without merit.

Medical Causation
In assignment of error number four, Shoney's asserts that the trial court erred in finding that Dr. Shows was disabled as a result of the accident at issue. Shoney's argues in brief that Dr. Shows "failed to prove that she was unable to practice as a cardiologist and failed to prove that any limits placed on her practice were due completely to her intermittent back pain, the only condition which resulted from the Shoney's fall." Dr. Shows alleges that "the trial judge's conclusion that [she] is permanently and severely disabled due to her fall at Shoney's was eminently reasonable and supported by voluminous evidence." We have thoroughly reviewed the extensive medical evidence presented in this case and conclude that the trial court was in error in its finding regarding Dr. Shows' disability.
In a personal injury suit, the plaintiff bears the burden of proving a causal relationship between the injury sustained and the accident which caused the injury. The plaintiff must prove causation by a preponderance of the evidence. The test for determining the causal relationship between the accident and subsequent injury is whether the plaintiff proved through medical testimony that it is more probable than not that, the subsequent injuries were caused by the accident. Maranto v. Goodyear Tire & Rubber Co., 94-2603, 94-2615, p. 3 (La.2/20/95), 650 So.2d 757, 759. A tort-feasor is liable only for damages caused by his negligent act. He is not liable for damages caused by separate, independent or intervening causes. Hence, the plaintiff has the burden of proving that her injuries were not the result of separate, independent, and intervening causes. Thomas v. Hartford Insurance Company, 540 So.2d 1068, 1075 (La.App. 1 Cir.), writ denied, 542 So.2d 516 (La.1989).
It is well settled in our jurisprudence that a trial court's finding regarding causation is a factual finding and must be reviewed under the manifest error standard of review. Robling v. Allstate Insurance Company, 97-0582, p. 4 (La. App. 1 Cir. 4/8/98), 711 So.2d 780, 783. As an appellate court, we cannot set aside the trial court's factual findings unless we determine that there is no reasonable factual basis for the findings and the findings are clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). Thus, if the findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
In oral reasons for judgment, the trial court found that the low back pain suffered by Dr. Shows was due to the injury she incurred at Shoney's. The court further noted that "Dr. Shows has endured insufferable pain for the past 10 years and will continue to endure such pain for the rest of her life." In awarding damages to Dr. Shows, the trial court held that the injuries sustained by Dr. Shows in the fall at Shoney's were "permanent" and "disabling." We agree that because of the low back injury sustained by Dr. Shows as a result of the fall at Shoney's, Dr. Shows has suffered, and will suffer, extensive pain. We cannot, however, agree with the trial court's finding that Dr. Shows was rendered permanently disabled as a result of the incident at Shoney's. It is clear from the record that there were "separate, independent, and intervening causes" that resulted in a limitation of Dr. Shows' activities and ability to work as an invasive cardiologist.
Testifying at the trial of this matter were several physicians and a physical therapist who had treated Dr. Shows over the years. Dr. John Robert Humphries, an orthopedic surgeon, testified that he treated Dr. Shows following the incident at Shoney's. After examining Dr. Shows and *733 taking x-rays of her low back, Dr. Humphries determined that Dr. Shows had a fractured coccyx, as well as some arthritic changes in her low back. In Dr. Humphries' opinion, the degenerative changes revealed in the x-rays were not caused by the accident at Shoney's. He advised Dr. Shows to limit her activities for a few days. According to Dr. Humphries, Dr. Shows inquired about whether she could perform a heart catheterization scheduled for the following week, and he told her she would "just have to play it by ear and see how she looked next week."
Dr. Humphries continued to treat Dr. Shows during the month of October 1988 for her fractured coccyx and noted that Dr. Shows began complaining of pain radiating into her legs on October 17, 1988. She was next seen on January 10, 1989, at which time she advised Dr. Humphries that she had not missed work since she had last seen him. Dr. Shows also advised Dr. Humphries that she had been having bowel difficulties. When asked if the bowel difficulty was in any way related to the fractured coccyx sustained in the fall at Shoney's, Dr. Humphries responded, "I really didn't think the bowel discomfort was necessarily coming from that."
Dr. Humphries next saw Dr. Shows in his office on March 1, 1989. She indicated that she had been doing fairly well until lately when she had performed several heart catheterizations. X-rays taken on this day revealed that the coccyx fracture was stable. Her primary complaint was lumbar pain with radicular pain down the right leg. Dr. Humphries was of the opinion that "she had an aggravation of her chronic on-going problem."
Dr. Humphries testified that he last saw Dr. Shows on October 3, 1989, at which time her complaints were primarily the same. She advised him that she had been involved in a motor vehicle accident in March 1989 "that seemed to have worsen [sic] things somewhat." Dr. Humphries told Dr. Shows to continue with her current treatment and return to see him on as-needed basis. Dr. Humphries conceded that Dr. Shows' coccyx pain "could be a life long problem." However, he noted that as of the last time he saw Dr. Shows, he was under the impression that she was able to perform heart catheterizations. In fact, he never told Dr. Shows that she would have to permanently stop doing catheterizations. It was only during the early phase of her treatment that he had recommended that she stop doing the procedures and limit her activities. Thus, based on Dr. Humphries' testimony, it is apparent that he did not believe that Dr. Shows was permanently disabled as a result of the fall at Shoney's.
During the time that she was being treated by Dr. Humphries, Dr. Shows continued treatment with Dr. Susan Hunter-Joerns, a neurologist who had treated Dr. Shows for migraine headaches prior to the incident at Shoney's. According to Dr. Joerns' deposition testimony, Dr. Shows had a 20-year history of migraine headaches. Following the fall at Shoney's, Dr. Joerns saw Dr. Shows in February 1989 due to increased headaches. Dr. Joerns primarily treated Dr. Shows for headaches, but by October 1989, she had also begun treating Dr. Shows for low back pain and radicular pain into the right posterior leg. Dr. Joerns continued to treat Dr. Shows for the back pain and headaches through the next few years.
Dr. Joerns was notified in March 1989 that Dr. Shows was involved in a motor vehicle accident and was experiencing neck problems and numbness in her right hand. Dr. Shows began to show signs and/or symptoms of thoracic outlet syndrome in May 1989. Dr. Joerns indicated that although there were no complaints of bladder or bowel problems until April 1991, Dr. Shows advised her that the onset of these symptoms was "mid to late" 1988. Based on our review of the medical evidence, this assertion by Dr. Shows is not supported by the record: Dr. Shows was involved in another motor vehicle accident in January *734 1993, following which she experienced increased pain in her middle and lower back.
While Dr. Joerns opined that there was a 95% probability that Dr. Shows' low back pain was caused by the fall at Shoney's, she was not as certain about the origin of Dr. Shows' other medical problems. According to Dr. Joerns, it was more probable than not that the neck pain, thoracic outlet syndrome, and the numbness in the arms were caused by the 1989 accident, and later aggravated by the 1993 accident. With regard to Dr. Shows' migraine headaches, Dr. Joerns testified that "[Dr. Shows] had only a minimal increase in her headaches initially [after the fall at Shoney's], and it was primarily the next motor vehicle accident that she had that provoked the headache pattern to be much worse." Dr. Joerns further indicated:
The motor vehicle accident, the first motor vehicle accident, significantly changed her neck pain, created the major symptoms initially with primarily the right arm pain that showed up as thoracic outlet initially but in retrospect was probably just a worsening cord compression, worse on the right as evidenced by the films. This has continued to be a problem and gotten worse since then with very little effect from the second motor vehicle accident.
This also is what has changed her headache pattern from being a regular migraine headache pattern only every so often, [to] every couple of months, causing her to take off work, to being an almost daily headache pattern that is causing a great deal of distress, daily time-out, and aggravation.
Dr. Joerns opined that the Shoney's fall precipitated Dr. Shows' neck problems, which became symptomatic after the 1989 motor vehicle accident. In support of this position, Dr. Joerns testified that after the accident at Shoney's, Dr. Shows had a history of urinary problems and a positive Lhermitte's sign, indicative of cord compression. According to Dr. Joerns, the 1989 accident provoked a further worsening of Dr. Shows' neck, with Dr. Shows suffering from neck and arm pain. While we appreciate Dr. Joerns' opinion regarding Dr. Shows' neck injury, we have found no support for this opinion in the extensive medical evidence in the record. Prior to the 1989 accident, there was no medical documentation of complaints of neck or arm pain by Dr. Shows. It was not until after the 1989 accident that Dr. Shows began to complain about neck and arm pain that ultimately resulted in Dr. Shows undergoing a cervical fusion in March 1993.
Furthermore, there was no indication in Dr. Joerns' testimony that she ever found Dr. Shows to be disabled. Rather, Dr. Joerns advised Dr. Shows to make adjustments in her schedule that would allow her to perform procedures in a staggered fashion.
Also testifying on Dr. Shows' behalf was Dr. Susan Lynn Scarberry, a board certified neurologist. Dr. Scarberry began treating Dr. Shows in May 1996 for migraine headaches. While her treatment of Dr. Shows focused primarily on migraine headaches, she diagnosed Dr. Shows with a possible lumbosacral radiculopathy in October 1996 based on her complaints of pain in the lateral aspect of her left leg radiating into her foot. Dr. Shows continued treatment with Dr. Scarberry, but was also referred to Dr. Rodrigue for epidural steroid injections. In January 1997, Dr. Scarberry made a definite diagnosis of lumbosacral radiculopathy.
Dr. Scarberry's treatment of Dr. Shows continued throughout the next year. Dr. Shows continued to complain of back pain but also began complaining of more significant headaches and pain in her shoulders and arms. There were times when Dr. Shows would tell Dr. Scarberry that her back pain had completely resolved. In January 1998, Dr. Shows was diagnosed with radial nerve palsy. According to Dr. Scarberry, this condition was improving, *735 and Dr. Shows had a "very good prognosis for complete recovery."
Based on her review of Dr. Shows' medical records and her own examination of Dr. Shows, Dr. Scarberry was of the opinion that Dr. Shows' back pain was directly caused by the fall at Shoney's and "has continued because of changes induced by the fall." Dr. Scarberry testified that Dr. Shows' back pain will "wax and wain [sic]," but will never completely resolve. Dr. Scarberry never attributed Dr. Shows' other medical problems, i.e., her headaches, bladder/bowel problems, neck pain, shoulder pain, radial nerve palsy, or thoracic outlet syndrome, to the Shoney's fall.
Regarding Dr. Shows' ability to continue working, Dr. Scarberry acknowledged that Dr. Shows may be unable to perform inevasive procedures such as heart catheterizations because of the pain from standing and from having to wear the lead aprons. She noted, however, that Dr. Shows could continue to work as a noninvasive cardiologist. She would be able to "examine patients ... manage patients both in the hospital and as an outpatient ... do echocardiograms ... [and] read EKG's." Dr. Scarberry further recognized that Dr. Shows could perform the functions of an internist. Thus, it was apparently Dr. Scarberry's opinion that Dr. Shows was not disabled as a result of the fall at Shoney's.
The final medical witness to testify on Dr. Shows' behalf was Richard Lane, a physical therapist who began treating Dr. Shows in January 1992 for complaints of low back pain. Mr. Lane indicated that throughout his treatment of Dr. Shows, which included over 152 office visits, her primary complaint was low back pain. After the 1989 accident, Dr. Shows also had complaints of headaches and neck pain. Overall, Mr. Lane felt that Dr. Shows' condition was "up-and-down ... [s]he has had exacerbation of symptoms as well as relief." From a physical therapy standpoint, Mr. Lane opined that Dr. Shows' back pain was what was preventing her from working. He acknowledged, however, that relating a disability to a specific dysfunction is impossible.
Two medical experts testified on behalf of Shoney's regarding Dr. Shows' injuries. The first to testify was Dr. Harry J. Gold, III, a neurologist who was offered and accepted as an expert in pain management, neurology and anatomy. Dr. Gold examined Dr. Shows in early February 1998 at the LSU Medical Center. His examination included a complete history of Dr. Shows' current problems, an evaluation of her past medical history, a general medical exam, and a neurological exam. In Dr. Gold's opinion, Dr. Shows suffered from a chronic degenerative condition of the lumbar spine.
Dr. Gold indicated that the fall at Shoney's did not cause all of Dr. Shows' problems. He testified that there were a number of factors associated with Dr. Shows' condition, such as "normal wear and tear on the vertebral column due to forces of gravity and standing in an upright position" and the "work hazards" associated with her occupation. Dr. Gold stated that while the fall at Shoney's may have aggravated Dr. Shows' condition for a short period of time, he did not believe that the fall had "changed the progress of the underlying problem." In his estimation, it was probably inevitable that Dr. Shows would suffer from this back problem, irrespective of the Shoney's incident.
According to Dr. Gold, this chronic degenerative condition was not a curable disease process. He noted, however, that after 4 to 6 months of "complete back rest," he would recommend a "work hardening type of program" and "regular interarticular injections" to increase Dr. Shows' endurance. The whole process would take 6 to 9 months, after which there would be limitations on Dr. Shows with respect to bending, stooping and lifting. Dr. Gold noted that although Dr. Shows would likely have symptoms for the rest of her life, her pain would be ameliorated *736 to the point where she could return to work as a noninvasive cardiologist or perhaps begin a practice as an internist. He also acknowledged that if Dr. Shows does not go through a program similar to what he described, she would not be able to practice as either a noninvasive cardiologist or an internist.
The final medical expert to testify was Dr. Toussaint A. Leclercq, the neurosurgeon who eventually operated on Dr. Shows. He first saw Dr. Shows in March 1993. Dr. Shows gave a history of a fall in 1988 with associated low back pain and a motor vehicle accident in 1989 that resulted in a neck injury. She also complained of headaches originating in her neck and indicated that she had a history of migraine headaches as a teenager. In Dr. Leclercq's opinion, the neck injury came from the 1989 accident and the headaches were unrelated to any accident. Dr. Leclercq diagnosed spinal stenosis or narrowing of the spine at C3-C4 resulting in spinal cord compression.
Dr. Leclercq performed a cervical fusion at C3-C4 in March 1993. Following the surgery, Dr. Leclercq assigned a 10-15% medical impairment to Dr. Shows as a whole. He also advised Dr. Shows to avoid activities that would "require her to lift, push, or pull greater than 35 pounds, or bend repeatedly or flex or hyperextend the neck on a permanent basis." Dr. Leclercq released Dr. Shows to return to work as an invasive cardiologist on June 30, 1993.
Dr. Shows returned to see Dr. Leclercq in 1994, with complaints of pain in the posterior aspect of her neck. Dr. Leclercq believed that she may have another pinched nerve, and performed a neurotomy that involved the cutting of the C2 occipital nerve root.
In Dr. Leclercq's opinion, the neck injury that resulted in these two surgeries was caused by the 1989 accident. According to Dr. Leclercq, the restrictions he placed on Dr. Shows following her surgery were related solely to her neck and were on a permanent basis. He also noted that the 10-15% impairment rating is an anatomical rating that has nothing to do with function.
Based on our review of the record in this case, we conclude that Dr. Shows failed to prove by a preponderance of the evidence that the fall at Shoney's rendered her permanently disabled. As previously indicated, Shoney's cannot be held liable for damages caused by "separate, independent or intervening causes." See Thomas, 540 So.2d at 1075. There is nothing in the record to support Dr. Shows' contention that she was permanently and severely disabled as a result of the Shoney's fall. The only injury that Dr. Shows has successfully proven was related to the Shoney's fall is her low back injury. The evidence in the record reveals that this is an intermittent condition that waxes and wanes. In light of the myriad of medical problems suffered by Dr. Shows, none of which were causally related to the Shoney's fall by any of the medical experts, we cannot agree with the trial court's finding that Dr. Shows was permanently disabled as a result of the incident at Shoney's. There is no medical evidence in the record to suggest that Dr. Shows cannot continue in her medical profession as either a noninvasive cardiologist or an internist. While Dr. Shows' income may be affected by this change, she will nonetheless be able to work. Thus, this finding by the trial court is reversed.

Lost Wages and Lost Earning Capacity
In its final assignment of error, Shoney's argues that the trial court's award for lost earnings and lost earning capacity should be vacated because of the trial court's prejudicial and erroneous exclusion of its expert economic witnesses. Shoney's further alleges that the awards should be vacated because they are "based on the speculative testimony of an economist which is inconsistent with the concrete financial information in the record."
With regard to the first part of this assignment of error, we have already determined *737 that the trial court was correct in excluding all but one of the experts named by Shoney's in its supplemental discovery responses. Based on our review of the record, we have concluded that Shoney's was not prejudiced in any way by this ruling of the trial court. However, regarding the testimony of Dr. Shows' expert economic witnesses, we have reviewed the evidence and find that they were in error in their basic assumptions.
It is well settled in Louisiana that the trial court is not bound by the testimony of an expert, but such testimony is to be weighed the same as any other evidence. Fountain v. Fountain, 93-2176, p. 5 (La.App. 1 Cir. 10/7/94), 644 So.2d 733, 738. A trial court may accept or reject in whole or in part the opinion expressed by an expert. Id. The effect and weight to be given expert testimony is within the broad discretion of the trial judge. The importance placed upon such testimony is largely dependent upon the expert's qualifications and the facts that form the basis of his opinion. Thornton ex rel. Laneco Construction Systems, Inc. v. Lanehart, 97-2871, p. 5 (La.App. 1 Cir. 12/28/98), 723 So.2d 1127, 1130, writ denied, 99-0177, ___ So.2d ___, 1999 WL 194493 (La.3/19/99). Further, a trial judge may substitute his/ her own common sense and judgment for that of an expert witness when such a substitution appears warranted on the record as a whole. Goodwin v. Goodwin, 618 So.2d 579, 586 (La.App. 2 Cir.), writ denied, 623 So.2d 1340 (1993); See also, Galloway v. Gaspard, 340 So.2d 579, 583 (La. App. 1 Cir.1976).
Mr. James Ramsey was offered and accepted as an expert in accounting on behalf of Dr. Shows. In preparation for his testimony, Mr. Ramsey reviewed Dr. Shows' income tax returns through 1997. He referred to the MGMA guidelines, which include national data, to determine the average yearly income of cardiologists in the Baton Rouge area. According to Mr. Ramsey, he based his findings on data found in the section of the guidelines wherein cardiology practices were separated by region. He acknowledged, however, that this data was not gender specific, and in fact, was comprised of information obtained from 708 male cardiologists and only 31 female cardiologists. Mr. Ramsey recognized that nationwide in the field of cardiology, there is great disparity between the average income of males as opposed to females, with female cardiologists earning approximately 30% less per year than male cardiologists.
Mr. Ramsey also included data for the local Baton Rouge market in his research. He spoke with approximately 28 cardiologists in the Baton Rouge area and determined that an invasive cardiologist practicing in the Baton Rouge area would average $350,000.00 per year. He acknowledged that most of the cardiologists that he consulted in arriving at this figure were from group practices and that none of them were from solo practices. Mr. Ramsey indicated that without conducting another survey, he would be unable to comment on the average income of cardiologists, either invasive or noninvasive, who are in solo practices.
Referring to the MGMA guidelines, Mr. Ramsey stated that the average yearly income in 1996 for a female noninvasive cardiologist was $214,000.000. He further noted that based on the guidelines, the average yearly salary for a female practicing internal medicine would be $119,998.00.
Utilizing the information provided by Mr. Ramsey in his report, Dr. Randolph Rice was asked to determine Dr. Shows' past lost wages and loss of earning capacity as a result of the incident at Shoney's. Noting that Dr. Shows had almost two full years of practice prior to her fall at Shoney's, Dr. Rice built on those earnings to approximate what her income would have been, between the time of the accident and the date of trial, had she not been injured at Shoney's. Based on Mr. Ramsey's findings that the average yearly salary for a male cardiologist practicing in the Baton Rouge area was $350,000.00, and his own *738 analysis of Dr. Shows' actual earnings, Dr. Rice determined that Dr. Shows' past lost earnings were $2,152,209.00. Similarly, in calculating Dr. Shows' future lost earnings, Dr. Rice projected her income forward over the remainder of her work life expectancy, i.e. 26.14 years. Assuming Dr. Shows would earn nothing in the future, Dr. Rice calculated the present value of her future earnings at $6,768,390.00. Dr. Rice was then asked to calculate Dr. Shows' future earnings assuming that she could earn $73,804.33 yearly. This figure was determined to be Dr. Shows' average yearly income based on her actual earnings in 1994, 1995 and 1996. Using these figures, Dr. Rice calculated Dr. Shows' future earnings at $5,263,171.00.
After hearing all of the evidence regarding Dr. Shows' claim for economic losses, the trial court rendered judgment from the bench. The court awarded Dr. Shows $2,152,209.00 in past lost wages and $5,263,171.00 in future lost earnings. In its reasons for judgment, the court noted that the award for "future lost earnings was assuming that [Dr. Shows] could earn an average of $73,804.00 a year which was the average for '94, '95 and '96."[5]
The court apparently accepted the testimony of Dr. Shows' economic expert witnesses. It is clear from the judgment that the court did not take into account the speculative nature of the figures proposed by Mr. Ramsey and used by Dr. Rice in his calculations, nor did the court consider the 30% disparity in earnings between male and female cardiologists. Furthermore, in awarding economic damages to Dr. Shows, the court did not factor in the many intervening causes that contributed to Dr. Shows' medical condition and her inability to continue her work as an invasive cardiologist. We find the trial court's acceptance of Dr. Rice's figures to be patently unsound and manifestly erroneous. Thus, we are required to review the record as a whole and determine what amount would appropriately compensate Dr. Shows for the economic losses she has suffered as a result of the Shoney's fall.
Based on our review of the testimony of both Mr. Ramsey and Dr. Rice, we believe that the base figure utilized in the pertinent calculations is inflated. As indicated, the average yearly income for an invasive cardiologist practicing in the Baton Rouge area is $350,000.00. However, this figure is based on male cardiologists in group practices. Dr. Shows has been a solo practitioner since the second year of her practice and has expressed a desire to remain in a solo practice. By Mr. Ramsey's own admission, he would be unable to comment on the average income of cardiologists who are in solo practices without conducting another survey. We agree that Mr. Ramsey should have polled solo practitioners in order to accurately determine the average yearly income that Dr. Shows could be expected to earn.
Considering the expert testimony in this case, we conclude that the trial court's awards for lost earnings and lost earning capacity should be reduced by 30%, which percentage represents the earning disparity between male and female cardiologists. Thus, the award for past lost wages becomes $1,506,546.30, and the award for future lost earnings becomes $3,684,219.70. However, our inquiry does not end here. These awards must be further reduced to accurately reflect the portion of the damages that are attributable to the Shoney's fall.
*739 Based on the extensive medical evidence in the record that we have previously discussed in great detail, we do not believe that Shoney's is responsible for the entirety of these awards. Shoney's can only be held liable for damages caused by its negligence, not for damages caused by separate, independent or intervening causes. See Thomas, 540 So.2d at 1075. From the time of the Shoney's fall until the time of trial, Dr. Shows has suffered from a myriad of medical problems that prevented her from working in her chosen profession. Specifically, Dr. Shows underwent two separate surgical procedures, including a cervical fusion, for a neck injury that she sustained in an automobile accident in 1989. Following these surgeries, her treating physician assigned a 10-15% medical impairment to Dr. Shows as a whole. It is clear from the record that these surgeries, along with the other medical problems that Dr. Shows suffered from during this period, adversely affected her earnings and earning potential. We find that Shoney's is only responsible for 50% of these damage awards, i.e. 50% of $1,506,546.30 or $753,273.15 for past lost wages and 50% of $3,684,219.70 or $1,842,109.85 for future lost earnings. Thus, we amend the trial court's award of damages accordingly.

II. DR. SHOWS' APPEAL

General Damages
Dr. Shows argues in brief that "[g]iven the absolutely devastating effect that this injury has had upon ... her life and practice," the trial court's award of $300,000.00 in general damages was "clearly an abuse of discretion." Dr. Shows also alleges that the trial court failed to consider loss of enjoyment of life and was in error in failing to compensate her for this element of damages. In answer to this assignment of error, Shoney's asserts that "the $300,000.00 general damage award should be reduced since most of [Dr. Shows'] medical problems, and certainly her most severe ones, were unquestionably caused by the 1989 motor vehicle accident [and] not by the Shoney's fall." Shoney's further states that the trial court clearly considered Dr. Shows' claim for loss of enjoyment of life in making the general damage award.
In oral reasons for judgment, the trial court recognized the serious nature of the injury sustained by Dr. Shows in the fall at Shoney's.
After carefully considering the evidence presented in this case this court finds as follows: The lower back pain suffered by Dr. Shows is due to the injury that Dr. Shows incurred in October of 1988 at Shoney's. The court reaches this determination based primarily on the testimony of Dr. Scarberry, Dr. Humphries, Dr. Joerns, Mr. Lane and the plaintiff, Dr. Shows. This court is convinced that Dr. Shows has endured insufferable pain for the past 10 years and will continue to endure such pain for the rest of her life. I found Dr. Shows to be a credible witness and no other witnesses appeared to believe that she was dishonest or malingering in any way. It is certainly tragic to this court that Dr. Shows would spend much of her adult life preparing for a profession as a physician only to find at the age of 34 an injury could cause her such pain that she would no longer be able to practice the profession for which she'd spend 10 years of her life preparing. Furthermore, this court finds that due to the pain Dr. Shows suffers because of the October 1988 injury her life has changed immeasurably.
The court then awarded Dr. Shows $175,000.00 for past, present and future physical pain and suffering, and $125,000.00 for past, present and future mental pain and suffering.
It is well settled that the trier of fact has much discretion in awarding damages. La. C.C. art. 2324.1. The standard for appellate review of general damages is set forth in Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. *740 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), wherein the Louisiana Supreme Court stated that "the discretion of the trier of fact is `great,' and even vast, so that an appellate court should rarely disturb an award of general damages." The appellate court's first inquiry should be "whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the `much discretion' of the trier of fact." Youn, 623 So.2d at 1260. "It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award." Youn, 623 So.2d at 1261.
As previously indicated, Dr. Shows sustained a fractured coccyx as a result of her fall at Shoney's. This injury has produced a substantial amount of pain and discomfort for which Dr. Shows has undergone physical therapy and numerous epidural steroid injections. According to the medical evidence in the record, her low back condition will likely be a life-long problem that could worsen with time.
Based on our review of the evidence contained in the record, we find no abuse of discretion by the trial court in the damages awarded. While the general damage award in this case may be on the high side, it is not so high as to constitute an abuse of the trial court's vast discretion. Given the "particular injuries and their effects under the particular circumstances" on the plaintiff, the trial court's general damage award is not beyond that which a reasonable trier of fact could assess. See Youn, 623 So.2d at 1260. Thus, this assignment of error is without merit.

Special Damages
In her second assignment of error, Dr. Shows asserts that the trial court's award for future lost earnings was an abuse of discretion. As we previously discussed in detail, we agree that the trial court's award for future lost earnings and past lost earnings was in error for a number of reasons. However, unlike Dr. Shows, we do not believe that an increase in the awards is warranted. On the contrary, we have reduced the awards to $753,273.15 for past lost earnings and $1,842,109.85, which will appropriately compensate Dr. Shows for the economic losses she has sustained as a result of the fall at Shoney's. Accordingly, no further discussion on this issue is necessary. This assignment of error lacks merit.

Medical Expenses
In answering Dr. Shows' appeal, Shoney's argues that the trial court's award for medical expenses is not supported by the record and should be reduced. Shoney's asserts that several of the medical bills submitted by Dr. Shows are unrelated to the fall at Shoney's and should have been eliminated from the trial court's award of medical expenses. We agree.
The trial court awarded Dr. Shows $75,000.00 for past, present and future medical expenses. While the court did not specify what portion of this award was for future medical expenses, we were able to discern from the record that Dr. Shows' past medical expenses totaled $63,145.70. Thus, it follows that the trial court awarded Dr. Shows $11,854.30 in future medical expenses.
A reviewing court should not set aside an award of special damages unless an analysis of the facts and circumstances reveals an abuse of discretion in setting the award. Rochel v. Terrebonne Parish School Board, 93-0383, p. 7 (La. App. 1 Cir. 5/20/94), 637 So.2d 753, 757-758, writ denied, 94-1613 (10/7/94), 644 So.2d 633. A plaintiff may ordinarily recover reasonable medical expenses, past and future, which are incurred as a result of an injury. However, a plaintiff must prove the existence of the injuries and a causal connection between those injuries and the accident. White v. Longanecker, 93-1122, p. 9 (La.App. 1 Cir. 5/23/94), 637 *741 So.2d 1213, 1218, writ denied, 94-1704 (10/7/94), 644 So.2d 640. As previously indicated, the test for determining the causal relationship between the accident and subsequent injury is whether the plaintiff proved through medical testimony that it is more probable than not that the subsequent injuries were caused by the accident. Maranto, 94-2603, 94-2615 at 3, 650 So.2d at 759.
Based on the medical evidence in the record, we find no abuse of discretion by the trial court in awarding Dr. Shows future medical expenses in the amount of $11,854.30. Although there is no evidence to suggest that Dr. Shows' back condition will necessitate surgery in the future, there is substantial evidence that this will be a life-long problem for Dr. Shows. It is likely that she will need to continue with her physical therapy and possibly need to undergo additional epidural steroid injections for her persistent low back pain. Thus, we will not disturb the trial court's award of $11,854.30 in future medical expenses.
With regard to past medical expenses, however, we find that the trial court's award of $63,145.70 was an abuse of discretion. As previously discussed, Dr. Shows was unable to causally relate all of her medical problems to the fall at Shoney's. Specifically, the cervical fusion and subsequent neurotomy performed by Dr. Leclercq, as well as several diagnostic tests that were limited to Dr. Shows' cervical spine, were related to the cervical injuries sustained by Dr. Shows in the March 1989 motor vehicle accident. Furthermore, included in the past medical expenses submitted by Dr. Shows were several bills relating treatment that she received in June 1996 for an eye condition that resulted in impaired vision.
We have reviewed the summary of medical bills submitted by Dr. Shows, and have determined that $18,845.48 represents the total amount of unrelated medical bills that should have been disallowed by the trial court in its award. Accordingly, we reduce the trial court's award of past medical expenses by $18,845.48, and amend the award to $44,300.22. Thus, the total award for past, present and future medical expenses is $56,154.52.

DECREE
For the above and foregoing reasons, we reverse the trial court's finding that Dr. Shows is permanently disabled as a result of the fall at Shoney's. The trial court's award of general damages in the amount of $300,000.00 is affirmed. However, the other portions of the trial court's award are amended as follows: (1) Past Lost Earnings$753,546.30; (2) Future Lost Earnings$1,842,109.85; and (3) Medical Expenses, Past and Future$56,154.52. In all other respects, the judgment of the trial court is affirmed. Costs of this appeal are assessed equally between the Dr. Shows and Shoney's.
REVERSED IN PART; AMENDED AND, AS AMENDED, AFFIRMED.
GUIDRY, J., concurs in the results.
FITZSIMMONS, J., concurs in the results by PETTIGREW, J.
NOTES
[1] As will be discussed later in detail, Dr. Shows was involved in two subsequent motor vehicle accidents in which she sustained new injuries, specifically a cervical injury that required surgical intervention.
[2] In a Supplemental and Amending Petition for Damages, Shoney's Restaurant was substituted for Shoney's Inn. For the sake of simplicity, the defendants will be collectively referred to as "Shoney's."
[3] As correctly noted by Dr. Shows in her objection to the amicus curiae brief submitted by United, the very issue raised by United regarding the discounting of past wages was previously considered by this court in Fanguy v. Dupre Brothers Construction Company, Inc., 588 So.2d 1251 (La.App. 1 Cir.1991), writ denied, 594 So.2d 892 (1992). In Fanguy, the defendants argued that plaintiff's award for loss of earning capacity should have been discounted back to the date of plaintiff's injury rather than the date of trial. In response, this court held:

We find this argument unpersuasive, since the whole purpose of discounting a future award is to allow for the difference in value of money received in the present for a future loss which has not yet accrued. Plaintiff's losses from the date of injury up through the date of trial are not future losses, and therefore should not be discounted.
Fanguy, 588 So.2d at 1260, n. 10.
[4] Although the transcript from this hearing reflects a date of December 15, 1998, this is an obvious typographical error. As this matter was tried on February 10-12, 1998, it would be illogical to believe that the hearing on this motion would have been held after the trial date. Further, the copy of the official court minutes in the record reflects the correct date of the hearing, December 15, 1997.
[5] We note an inconsistency in the trial court's reasons for judgment. Although the court concluded that Dr. Shows was permanently disabled as a result of the Shoney's fall, the court clearly calculated Dr. Shows' future lost earnings based on the assumption that she could earn $73,804.00 per year. As previously indicated, we disagree with the trial court's finding regarding disability. However, concerning the court's calculation of Dr. Shows' future lost earnings, while $73,804.00 may be on the low side, we do not find that the trial court was manifestly erroneous in using this figure in its calculations and will not disturb same.