ELIZABETH B. KILROY KINNEY
v.
RANDY J. BOURGEOIS
IN THE MATTER OF THE SUCCESSION OF ELIZABETH B. KILROY a/k/a ELIZABETH BENETTE KINNEY
No. 2006 CA 2384, Consolidated with No. 2006 CA 2385.
Court of Appeals of Louisiana, First Circuit.
September 14, 2007.
NOT DESIGNATED FOR PUBLICATION.
PETER J. LOSAVIO, KENT S. DEJEAN, CHRISTOPHER W. NIELSON, Counsel for Plaintiff/Appellant, Sonya Lewis Williams.
NANCY GOODWIN, and PHILLIP LUCIUS ALLEMAN, Counsel for Plaintiff/Appellee, Martha Kilroy.
DENISE NELSON AKERS, Counsel for Defendant/Appellee, Randy Bourgeois.
JOSEPH A. PROKOP, Jr., Counsel for Intervenor/2nd Appellant, Marshall D. Kilroy.
Before WHIPPLE, GUIDRY and HUGHES, JJ.
WHIPPLE, J.
In these consolidated matters, the executrix of a succession appeals the trial court's judgment declaring the decedent's August 25, 2004 will invalid due to the decedent's incompetence at the time of execution of the will. The decedent's son also challenges the portion of the trial court's judgment declaring that an earlier act of donation executed by decedent prior to death was not executed under duress or because of undue influence and, thus, was valid. For the following reasons, we affirm in part and reverse in part.

FACTS AND PROCEDURAL HISTORY
The matter before us consists of four consolidated suits involving the legal affairs and interests of Elizabeth Benette Kilroy, also known as Elizabeth B. Kilroy Kinney ("Mrs. Kinney"): a suit on a promissory note, a suit to revoke a donation, an interdiction proceeding and a succession proceeding. The interdiction proceeding was apparently rendered moot by the death of Mrs. Kinney and is not at issue in the instant appeal.
The suit on a promissory note arises from a loan by Martha Kilroy, the daughter-in-law of Mrs. Kinney, to Mrs. Kinney in the amount of $29,000.00 to assist Mrs. Kinney in the cash purchase of a home in Florida. Specifically, on October 29, 2003, Mrs. Kinney signed a promissory note acknowledging the debt. According to the promissory note, Mrs. Kinney agreed to repay the loan upon the sale of her home located at 1674 Broadmoor Court in Baton Rouge, or on April 30, 2004, whichever occurred first.[1] When Mrs. Kinney did not sell her home on Broadmoor Court and did not repay the funds borrowed by the specified date of April 30, 2004, Martha Kilroy filed suit to collect on the note. Following trial, the trial court rendered judgment in favor of Martha Kilroy in the amount of $29,000.00, together with interest and costs. This judgment has not been appealed and is not at issue herein.
The suit to revoke a donation arises from the fact that on July 1, 2004, Mrs. Kinney, who was suffering from terminal pancreatic cancer, executed an act of donation with reservation of usufruct, through which she donated her home located at 1674 Broadmoor Court to Randy Bourgeois, her hairdresser who had been helping care for her. However, Mrs. Kinney subsequently had a disagreement with Bourgeois and sought the return of her home. When Bourgeois refused to donate the home back to Mrs. Kinney, she filed suit on September 2, 2004, two days before her death, to revoke the donation to Bourgeois on the basis of lack of donative intent, alleging that the donation was a simulation.[2]
Meanwhile, Mrs. Kinney executed a will on August 25, 2004, naming as executrix Sonya Lewis-Williams, a neighbor who began assisting in Mrs. Kinney's care in early August 2004, after her disagreement with Bourgeois, and bequeathing all of her estate to Lewis-Williams and Kerry A. Williams, Lewis-Williams's husband.
Mrs. Kinney died shortly afterwards on September 4, 2004. Thereafter, on September 7, 2004, Lewis-Williams filed a petition to probate the August 25, 2004 will and to be confirmed as executrix. After the will was submitted for probate, Mrs. Kinney's son, Marshall Kilroy, filed a petition to annul the probated notarial testament on December 6, 2004, contending that the will was invalid due to lack of capacity, undue influence and fraud or duress.
Following Mrs. Kinney's death, Lewis-Williams, as executrix of Mrs. Kinney's estate, was substituted as party plaintiff in the suit to revoke the donation of the home on Broadmoor Court to Bourgeois. In addition to alleging lack of donative intent and that the donation was a simulation, Lewis-Williams also asserted that the donation should be declared null because of undue influence and/or fraud by Bourgeois. Marshall Kilroy intervened in the suit to revoke the donation of the Broadmoor Court home, also alleging that the donation was null on the bases of lack of capacity, lack of donative intent, undue influence and fraud.
Following trial in these consolidated matters, the trial court found as a fact that the donation of the Broadmoor Court home was a valid donation and was not the result of any duress or undue influence. However, with regard to the August 25, 2004 will, the court found Mrs. Kinney lacked capacity at the time she executed the will, which was executed ten days before her death.[3] From the judgment declaring the act of donation of the Broadmoor Court home to be valid and the August 25, 2004 will to be invalid, both Lewis-Williams and Marshall Kilroy appeal.
Lewis-Williams lists two assignments of error, contending that the trial court committed legal error in: (1) finding that the August 25, 2004 will was invalid due to Mrs. Kinney's lack of capacity; and (2) finding that the July 1, 2004 act of donation from Mrs. Kinney to Bourgeois was valid.
Marshall Kilroy contends on appeal that: (1) he was denied due process when the trial court allowed him only fifteen minutes to present his case-in-chief and allowed him no rebuttal in the trial of the petition to annul the probated notarial testament; (2) the trial court erred when it refused to admit the decedent's certified medical records into evidence; (3) the trial court erred when it excluded his psychiatrist as an expert witness; (4) the trial court erred when it found that there was no undue influence in the July 1, 2004 act of donation with reservation of usufruct; and (5) the trial court erred when it did not rule on Mrs. Kinney's capacity to execute the testaments dated April 20, 2004 and May 17, 2004.

EVIDENTIARY ISSUES (Marshall Kilroy's Assignments of Error Nos. 2 & 3)
In his second and third assignments of error, Marshall Kilroy challenges the trial court's rulings excluding certain evidence and testimony. Because a finding of an evidentiary error may affect the applicable standard of review, in that this court must conduct a de novo review when the trial court commits an evidentiary error that interdicts the fact-finding process, alleged evidentiary errors must be addressed first on appeal. Wright v. Bennett, XXXX-XXXX (La. App. 1st Cir. 9/28/05), 924 So. 2d 178, 182.
In his second assignment of error, Marshall Kilroy contends that the trial court erred in refusing to admit the decedent's certified medical records into evidence, and we agree. Counsel for Lewis-Williams objected to the medical records on the basis that there was no one present to authenticate the records and no one available for cross-examination. The trial court refused to admit the medical records into evidence on the basis that the opposing parties would not have the opportunity to cross-examine anyone or to dispute the medical records.
The general statutory authority for the admissibility of medical records is located in LSA-R.S. 13:3714, which provides, in part, as follows:
Whenever a certified copy of the chart or record of any hospital, signed by the administrator or the medical records librarian of the hospital in question, or a copy of a bill for services rendered, medical narrative, chart, or record of any ... health care provider ... is offered in evidence in any court of competent jurisdiction, it shall be received in evidence by such court as prima facie proof of its contents, provided that the party against whom the bills, medical narrative, chart, or record is sought to be used may summon and examine those making the original of the bills, medical narrative, chart, or record as witnesses under cross-examination. (Emphasis added).
The medical records exception obviates the need for laying a foundation for admissibility. Louisiana, like other states, considers medical records to be inherently reliable, because there is no motive for the person whose duty it is to make the entries to do other than record them correctly and accurately. Thus, the purpose of LSA-R.S. 13:3714 is to eliminate the requirement that the proponent of medical records lay a foundation for their admission, beyond certification. Judd v. State, Department of Transportation and Development, 95-1052 (La. 11/27/95), 663 So. 2d 690, 694-695.
Moreover, contrary to the trial court's stated reasoning herein, the statute shifts the burden to the other party to undermine the medical record's evidentiary weight and veracity by cross-examining those who made the record. Judd, 663 So. 2d at 695. If the other party chooses not to depose those doctors or other health care providers before trial or not to call such witnesses at trial, that party cannot then claim to have been deprived of the right to cross-examine the health care providers whose records are introduced pursuant to LSA-R.S. 13:3714. See Morris v. Southern Life & Health Insurance Company, 430 So. 2d 792, 795 (La. App. 5th Cir. 1983). Accordingly, we conclude that the trial court committed legal error in refusing to accept into evidence Mrs. Kinney's certified medical records offered by Marshall Kilroy.[4] Furthermore, given the issues before the court in this very sad case, we must conclude that the trial court's erroneous exclusion of these medical records interdicted the factfinding process.
We also find merit to Marshall Kilroy's third assignment of error, wherein he contends that the trial court erred when it refused to allow his expert psychiatrist, Dr. Robert Blanche, to testify.
The record reflects that one week before trial, Lewis-Williams filed a motion in limine, seeking to exclude the testimony of Dr. Blanche on the bases: that Marshall Kilroy did not timely disclose Dr. Blanche as a witness despite discovery requests regarding the identity of expert witnesses; that counsel for Marshall Kilroy did not timely exchange his pretrial insert, listing Dr. Blanche as an expert witness; and that Dr. Blanche did not issue a report until after the discovery cutoff date. On the morning of trial, the trial court granted the motion in limine and refused to allow Dr. Blanche to testify because Dr. Blanche's report was not issued until six days after the discovery cutoff. On appeal, Marshall Kilroy contends that this ruling was in error because the name of his expert was disclosed fourteen days before the discovery deadline and over four weeks prior to trial, and that Lewis-Williams had ample time to depose Dr. Blanche prior to trial.
The trial court in its discretion may direct the attorneys for the parties to appear before it to consider, among other things, the control and scheduling of discovery and the identification of witnesses, documents and exhibits. LSA-C.C.P. art. 1551(A)(6) & (7). The court shall then render an order reciting the action taken at the conference, and such order controls the subsequent course of the action, unless modified at the trial to prevent manifest injustice. LSA-C.C.P. art. 1551(B).
Moreover, pursuant to LSA-C.C.P. art. 1428(1), a party is required to seasonably supplement his response to discovery with respect to any question directly addressed to "the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify and the substance of his testimony." Article 1428(3) further provides that "[a] duty to supplement responses may be imposed by order of the court." The trial court's case management schedule can constitute such an order. Shows v. Shoney's, Inc., 98-1254 (La. App. 1st Cir. 7/29/99), 738 So. 2d 724, 730. A trial court's ruling excluding testimony or evidence that is not timely disclosed pursuant to such an order is subject to the abuse of discretion standard of review. See Shows, 738 So. 2d at 730; Highlands Underwriters Insurance Company v. Foley, 96-1018 (La. App. 1st Cir. 3/27/97), 691 So. 2d 1336, 1339-1340.
In the instant case, a telephone status conference was apparently conducted on June 23, 2006.[5] According to the parties, dates for exchange of pretrial inserts, discovery cutoff and trial were established and set forth in the case management schedule. Specifically, pretrial inserts were to be exchanged by July 5, 2006, the discovery deadline was set for July 7, 2006, and the trial date was set for July 25, 2006.[6]
At the pretrial conference, counsel for Marshall Kilroy informed the parties that he intended to call an expert witness; however, he did not name the expert at that time. While counsel for Marshall Kilroy contended that he furnished Dr. Blanche's name to counsel for Lewis-Williams later that same day, counsel for Lewis-Williams disputed that assertion. Nonetheless, counsel for Lewis-Williams acknowledged that he was furnished with Dr. Blanche's name within "[s]everal days after the telephone status conference."
Thus, while it is true that Dr. Blanche did not issue his report until a few days after the discovery deadline, it is also apparent that counsel for Lewis-Williams was aware before the discovery deadline that Marshall Kilroy intended to call Dr. Blanche as an expert witness. Notably, while counsel for Lewis-Williams was vague about the exact date he obtained Dr. Blanche's name, he did not contend that he obtained this information after the discovery cutoff date of July 7, 2006, instead asserting only that he received this information "several days" after the June 23, 2006 telephone status conference. Yet, Lewis-Williams's counsel made no effort to depose Dr. Blanche upon obtaining Dr. Blanche's name prior to the discovery cutoff date. Instead counsel merely filed a motion in Limine on July 18, 2006, after the discovery deadline and only one week before the July 25, 2006 trial date, seeking to exclude Dr. Blanche's testimony and report.
The theory inherent in pretrial procedure is to avoid surprise and to allow orderly disposition of cases. Theriot v. State, Department of Wildlife and Fisheries, 94-1536 (La. App. 1st Cir. 4/7/95), 661 So. 2d 986, 989, writ denied, 95-1617 (La. 10/6/95), 662 So. 2d 1041. Given that counsel for Lewis-Williams, as well as all other counsel, was aware that Marshall Kilroy intended to call an expert to support his contentions at trial and that counsel for Lewis-Williams was aware of the name of that expert, at the very latest, within a few days of the June 23, 2006 status conference, the assertion that Dr. Blanche's testimony should have been stricken on the basis of surprise lacks merit. Moreover, while a trial court has great discretion in deciding whether to receive or refuse the testimony of a witness objected to on the grounds of failure to abide by the rules set forth in a pretrial order, or, similarly, case management schedule, any doubt must be resolved in favor of receiving the information. Palace Properties, L.L.C. v. Sizeler Hammond Square Limited Partnership, 2001-2812 (La. App. 1st Cir. 12/30/02), 839 So. 2d 82, 91, writ denied, XXXX-XXXX (La. 4/4/03), 840 So. 2d 1219. A party with actual knowledge of the identity of a witness should not be allowed to wait to object to the testimony at trial, or shortly before, merely for strategic purposes, while making no effort to ascertain the nature of that witness's testimony from the time of actually learning the witness's identity.[7] See
Abdon Callais Boat Rentals, Inc. v. Louisiana Power and Light Company, 555 So. 2d 568, 576 (La. App. 1st Cir. 1989), writ denied, 558 So. 2d 583 (La. 1990). Accordingly, we conclude that the trial court abused its discretion in refusing to allow the testimony of Dr. Blanche.[8] Moreover, our review of Dr. Blanche's proffered report indicates that this error clearly interdicted the factfinding process.
Where the erroneous exclusion of evidence interdicts the factfinding process, this court steps into the shoes of the factfinder and conducts a de novo review of all admissible evidence to ensure a fair trial and a fair judgment. Wingfield v. State, Department of Transportation and Development, 2001-2668 (La. App. 1st Cir. 11/8/02), 835 So. 2d 785, 799, writs denied, XXXX-XXXX, XXXX-XXXX, XXXX-XXXX (La. 5/30/03), 845 So. 2d 1059-1060, cert. denied, 540 U.S. 950, 124 S. Ct. 419, 157 L. Ed. 2d 282 (2003). Accordingly, we must conduct a de novo review of the trial court's rulings that the August 25, 2004 will was invalid due to Mrs. Kinney's lack of capacity and that the July 1, 2004 act of donation was valid. However, before we can conduct such a review, we must determine whether the time constraints placed upon the litigants by the trial court interfered with Marshall Kilroy's right to a fair trial, as he alleges in his first assignment of en-or, and, thus, preclude this court from conducting a de novo review of a complete record.

TIME CONSTRAINTS PLACED ON THE PARTIES (Marshall Kilroy's Assignment of Error Number 1)
In this assignment of error, Marshall Kilroy complains that the trial court limited the time allowed for the parties' presentation of evidence to such a degree that he was denied the opportunity for a fair trial. He contends that he was denied due process when the trial court allowed him only fifteen minutes to present his case-in-chief on his petition to annul the August 25, 2004 notarial testament. He further asserts that "[d]ue to the time constraints, the court did not hear and could not take into consideration the testimony of witnesses as to [Mrs. Kinney's] mental state in the period from when she was in Florida to when Sonya Lewis-Williams became involved."[9]
Pursuant to LSA-Const. art. 1, § 22, "[a]ll courts shall be open, and every person shall have an adequate remedy by due process of law and justice, administered without denial, partiality, or unreasonable delay." On the other hand, LSA-C.C.P. art. 1631 further provides that the court has the power to require that the proceedings be conducted in "an orderly and expeditious manner" and to control the proceedings at trial, "so that justice is done."
As noted by the Second Circuit Court of Appeal, the court's power to control trial proceedings as set forth in LSA-C.C.P. art. 1631 is limited by the phrase "so that justice is done." Furthermore, the due process clauses of the Louisiana Constitution and the Fourteenth Amendment of the United States Constitution guarantee litigants a right to a fair hearing. Nonetheless, "due process" does not mean litigants are entitled to an unlimited amount of the court's time. Goodwin v. Goodwin, 618 So. 2d 579, 583 (La. App. 2nd Cir.), writ denied, 623 So. 2d 1340 (La. 1993).
The Second Circuit in Goodwin noted that with today's overcrowded dockets, some trial judges, in seeking to shorten the length of trial in cases pending before them, have imposed time limits on litigants for the presentation of evidence. The court in Goodwin then set forth guidelines that trial courts should follow in imposing time limits on litigants. The appellate court noted therein that although a litigant should generally have the right to present all evidence that he or she possesses with regard to a contested issue at trial if the evidence is relevant, admissible and not cumulative, this right is limited by LSA-C.E. art. 403, regarding evidence where the probative value is substantially outweighed by undue delay and waste of time, and by the power granted to trial judges in LSA-C.C.P. art. 1631 to ensure that relevant, admissible, noncumulative evidence is presented in such a way that time will not be unnecessarily wasted. Goodwin, 618 So. 2d at 583.
The court then stated that in imposing time limits to carry out this objective, the trial court should consider the following: (1) before imposing time limitations in a case, the trial judge should be thoroughly familiar, through pretrial proceedings, with the claims of the parties, the proposed testimony and number of witnesses, and the documentary evidence to be presented; (2) if they are used, time limits should be imposed on all parties, before any party presents any evidence, and sufficiently in advance of trial for the litigants to prepare for trial within the limits imposed; (3) the trial judge should inform the parties before the trial begins that reasonable extensions of the time limits will be granted for good cause shown; (4) the trial judge should develop an equitable method of charging time against each litigant's time limits; and (5) the trial judge should put all of his rulings regarding time limits and the reasons for the rulings on the record. Goodwin, 618 So. 2d at 583-584.
With regard to the guideline suggesting that the trial judge should be familiar with the claims of the parties, the proposed testimony and number of witnesses, and the documentary evidence to be presented, the Second Circuit further noted that each litigant should be required to estimate the length of his or her case, and if necessary, the amount of time needed for each witness. The Second Circuit reasoned that, with this information, the trial judge would be in a good position to set reasonable time limits for the presentation of evidence, rather than arbitrary time limits. Goodwin, 618 So. 2d at 583.
In the instant case, there were three contested matters scheduled for trial: the suit on the promissory note, the suit to revoke the July 1, 2004 act of donation, and the suit to annul the August 25, 2004 notarial testament.[10] The parties submitted a pretrial order to the court on July 14, 2006, each listing the witnesses they planned to call and estimating the time required to present his or her claims in the three consolidated matters scheduled for trial. While Lewis-Williams, as executrix of Mrs. Kinney's estate, and Martha Kilroy each estimated that one day would be sufficient to try the matters concerning them, Marshall Kilroy candidly stated that he needed three days to present his evidence and testimony, and Randy Bourgeois estimated that he needed one to three days, depending on the stipulations of the parties.
Nonetheless, at the beginning of trial, the trial court stated that "[t]he matter is set for a one day bench trial. And the court plans on concluding the matter today." Counsel for Marshall Kilroy concedes that the litigants were given notice that the matter was set for a one-day bench trial. Nonetheless, we note that while the trial court did state that the consolidated matters would all be heard in one day, the court in fact was required to extend the trial to a second day.[11]
However, there was clearly no equitable method of charging time to each litigant, or even to each cause of action herein. Despite the strict limitation on the time allowed for trial of these matters, the trial court did not allocate time to each party or each case at the beginning of trial. Rather, the trial court merely attempted to hurry matters along throughout the trial, without specifying or allocating any real method of time management for these various contested causes of action. Thus, in addition to Marshall Kilroy being forced to limit his presentation of evidence throughout the trial of these matters due to the constant concern about inadequate time,[12] the "inevitable" result, as asserted by Marshall Kilroy, was that "the case tried last would be truncated."
In fact, when the suit to annul the August 25, 2004 will was finally before the court on the afternoon of the second day of trial, the trial court told the litigants that they had thirty minutes to try the matter. Although the trial court ultimately extended that time limit, the trial was extended by a matter of minutes, not hours. While the trial court did state that it would consider the testimony presented in the other consolidated matters when ruling upon the last matter tried, we must conclude that such harsh time constraints are not justifiable, given the complexities and contested nature of the matters before the court. See Lambert v. Lambert, 2006-2399 (La. App. 1st Cir. 3/23/07), So. 2d, n. 1.
In sum, a review of the trial transcript herein clearly indicates that the pervasive theme throughout the trial of these consolidated matters was that the trial court was hurrying these matters along. Although the trial court has the authority pursuant to LSA-C.C.P. art. 1631 to conduct proceedings in an orderly and expeditious manner, and we commend as laudable efforts to manage and control the court's busy docket, this authority cannot outweigh the need to have a full trial on the merits with adequate time to present witnesses and allow for cross-examination.
Nonetheless, based upon our review of the record, we conclude that, given the proffers and the evidence actually introduced at trial, we are able to conduct a complete and proper de novo review and adjudication of the issues raised herein. Specifically, while we have concerns about the restrictions imposed by the trial court, we deem the record sufficient to conduct a de novo review to address the issues of the validity of the August 25, 2004 will and the July 1, 2004 act of donation.

VALIDITY OF AUGUST 25, 2004 WILL (Lewis-Williams's Assignment of Error No. 1)
In her first assignment of error, Lewis-Williams contends that the trial court erred in concluding that the August 25, 2004 will in her favor was invalid due to Mrs. Kinney's lack of capacity. Despite the constrained nature of the trial below, we conclude that the record before us, when reviewed de novo and considering all evidence erroneously excluded, more than amply supports the finding that Mrs. Kinney lacked capacity to execute the August 25, 2004 will.
The capacity to make a will is tested at the time the will is made. LSA-C.C. art. 1471. To have capacity to make a donation inter vivos or mortis causa, a person must be able to comprehend generally the nature and consequences of the disposition that he or she is making. LSA-C.C. art. 1477. With regard to the issue of capacity, there exists a presumption that the testator possessed the requisite testamentary capacity. The burden of proving lack of testamentary capacity is upon the party alleging it, who must prove by clear and convincing evidence that the testator lacked capacity when the testament was executed. Succession of Brantley, 99-2422 (La. App. 1st Cir. 11/3/00), 789 So. 2d 1, 4, writ denied, XXXX-XXXX (La. 3/30/01), 788 So. 2d 1192. In determining testamentary capacity, the court can consider the physical and mental condition of the testator not only at the time of execution, but also prior and subsequent thereto, since the actions, conduct and physical and mental condition of the testator before and after the execution of the will are of probative value in deciding testamentary capacity. Succession of Brantley, 789 So. 2d at 4-5.
The record demonstrates that testing performed in March and April 2004 revealed that Mrs. Kinney, who was eighty-two years old at the time, was suffering from pancreatic cancer, which was "unresectable." After discussions with the diagnosing oncologist, Mrs. Kinney was referred to hospice. Thereafter, a series of events unfolded wherein Mrs. Kinney would request assistance with her daily activities and financial affairs from an individual with whom she was acquainted; would then, very soon after the relationship began, execute a will leaving her estate to that individual; would then relatively soon thereafter, feel betrayed by, become angry with and distrustful of, or disenchanted with that individual and seek out another caregiver in whose favor she would then execute a new will. In the last several months of her life, Mrs. Kinney apparently executed at least three wills in this manner.
On August 25, 2004, only ten days before her death, Mrs. Kinney executed a will in favor of Lewis-Williams, her neighbor who had begun visiting Mrs. Kinney, and apparently assisting in the handling of Mrs. Kinney's affairs, approximately three weeks before Mrs. Kinney's death.[13]
At the request of the attorney who drafted the August 25, 2004 will in favor of Lewis-Williams, Mrs. Kinney was examined by Dr. Louis Cenac, a psychiatrist who evaluated her on August 29, 2004. During that examination, which was conducted four days after the will was executed, Dr. Cenac performed a series of tests to assess Mrs. Kinney's testamentary capacity. Despite her poor performance on these assessment tests, Dr. Cenac nonetheless opined that Mrs. Kinney generally comprehended the nature of her actions. Despite his limited contact with the patient, he nonetheless felt she was not under any undue influence at the time she executed the August 25, 2004 will.[14]
However, when questioned further about Mrs. Kinney's performance on the mental status examination, Dr. Cenac acknowledged that Mrs. Kinney was unable to repeat a five-digit number that he listed for her; was unable to reverse a five-digit number that he read to her; was able to reverse a four-digit number only with a struggle; was unable to duplicate a pattern of geometric figures (consisting of squares and triangles) on the same page that the pattern was drawn; and "failed miserably" when asked to draw the face of a clock.[15] Also, Mrs. Kinney was unable to calculate what Dr. Cenac characterized as three "relatively simple" problems, a change-making problem, a ratio problem and a time and distance problem.
Dr. Cenac admitted that Mrs. Kinney did exhibit memory impairment and "perseveration," meaning that she was "unable to easily alter her mental set." On cross-examination, Dr. Cenac further acknowledged that perseveration is an indication of brain failure and that Mrs. Kinney was "having some brain failure." He also conceded on cross-examination that Mrs. Kinney had "moderate impairment" in her abstraction capacity, which is the ability to assemble a whole from component parts. Nonetheless, despite Mrs. Kinney's performance on these tests, Dr. Cenac maintained that she was able to comprehend the nature and consequences of the will she signed shortly before her death and was under no undue influence at that time.
Regarding Mrs. Kinney's physical condition at that time, Dr. Cenac acknowledged that when he evaluated Mrs. Kinney, she was in "severe" and "intense" pain, that she would suddenly experience a sharp pain that would cause her to vomit, and that she was "extraordinarily weak."[16] When he examined Mrs. Kinney three days later, Dr. Cenac noted that she would "soon experience gastrointestinal obstruction, stupor, and coma" and that her "death [was] imminent."
With regard to the information he considered other than his examination of Mrs. Kinney in rendering his opinion as to her mental capacity, Dr. Cenac admitted that he did not review Mrs. Kinney's medical records or a list of the medication she was taking, prior to rendering his opinion in his September 2, 2004 report.[17] Also, he did not talk to any family members or review any notes kept by her sitters. Rather, Dr. Cenac clearly took everything that Mrs. Kinney told him at face value, without testing the veracity of the history she gave him, which in many instances turned out to be inaccurate. For instance, Mrs. Kinney indicated to Dr. Cenac that she was born in 1918, when, in fact, she was born in 1921. She also misstated her age, stating that she was 84, when she was actually 83. She indicated that she had only one child, Marshall Kilroy, when, in fact, she had also had an older daughter. Additionally, Mrs. Kinney's version of various events that had transpired in the last year of her life differed significantly from the testimony of others and conflicted with documentary evidence presented.
The report of Dr. Robert Blanche, a board-certified psychiatrist, was proffered upon the trial court's refusal to allow his testimony, a ruling we have determined was in error. In his report, Dr. Blanche noted that he had serious ethical and professional concerns about Dr. Cenac's opinion, noting that Dr. Cenac's own data did not support his ultimate conclusion that Mrs. Kinney's cognitive faculties were sufficient for testamentary capacity. Dr. Blanche further noted that Dr. Cenac, in rendering his opinion, had not reviewed Mrs. Kinney's medical records, nor had Dr. Cenac interviewed non-biased caregivers.
In rendering his opinion of Mrs. Kinney's capacity, Dr. Blanche reviewed her medical records and the evaluation notes and reports of Dr. Cenac.[18] Dr. Blanche opined that, based on an analysis of Mrs. Kinney's medical records alone (which included the data from Dr. Cenac), Mrs. Kinney did not have testamentary capacity. Specifically, he noted that Mrs. Kinney's drawings for the clock test were typical of a pattern of dementia and/or delirium and that her medical records, which we have deemed were also erroneously excluded, demonstrated that she was temperamental, reactive, unreasonable, forgetful, paranoid, indecisive and easily manipulated and that her judgment was impaired.
Based upon our de novo review of the record, we find that the record before us clearly and convincingly supports the finding that Mrs. Kinney lacked capacity to execute the August 24, 2004 will, and that finding will be affirmed. Accordingly, this assignment of error by Lewis-Williams lacks merit.

VALIDITY OF JULY 1, 2004 ACT OF DONATION (Lewis-Williams's Assignment of Error No. 2; Marshall Kilroy's Assignment of Error No. 4)
The next issue to be determined by a de novo review of the record is the validity of the July 1, 2004 act of donation, wherein Mrs. Kinney donated her home located at 1674 Broadmoor Court in Baton Rouge to Randy Bourgeois, her hairdresser. In her second assignment of error, Lewis-Williams contends that the trial court committed legal error in finding the act of donation valid, where the donation was an absolute simulation. She further contends that the donation was procured under duress. Similarly, Marshall Kilroy, in his fourth assignment of error, contends that the trial court erred in upholding the donation and in finding that there was no undue influence upon Mrs. Kinney when she executed the act of donation in favor of her hairdresser.
A contract is a simulation when, by mutual agreement, it does not express the true intent of the parties. LSA-C.C. art. 2025. A simulation is absolute when the parties intend that their contract shall produce no effects between them. LSA-C.C. art. 2026. The law imposes a strict rule of evidence in contests between the parties to an absolute simulation: only written proof will suffice to establish the true agreement where one party disputes it. Thus, a supposed transferor cannot establish a simulation unless he or she produces a written counterletter or answers to interrogatories; the testimony of witnesses is not acceptable evidence to prove an absolute simulation in a contest between the alleged transferor and alleged transferee. See LSA-C.C. art. 2026, Revision Comments-1984, comment (b); Ridgedell v. Succesion of Kuyrkendall, 98-1224 (La. App. 1st Cir. 5/19/99), 740 So. 2d 173, 178.
However, where the controversy is between the transferee and the derivatives of the alleged transferor, the derivatives of the alleged transferor may have greater rights, such as the ability to use evidence other than a counterletter or interrogatories, than the transferor would have had. This occurs when the derivatives of the alleged transferor are creditors of that person. Ridgedell, 740 So. 2d at 179-180. On the other hand, where the derivative of the alleged transferor is the universal successor of that person, then the universal successor must stand squarely in the shoes of the supposed transferor and, therefore, should not have the privilege of advancing any evidence that would have been denied the alleged transferor. Ridgdell, 740 So. 2d at 180.
A "universal successor" is defined in LSA-C.C. art. 3506(28) as the person who "represents the person of the deceased." In the instant case, Lewis-Williams was substituted as plaintiff in Mrs. Kinney's suit to revoke the action of donation, as the independent executrix of the estate of Mrs. Kinney and was, therefore, "representing the person of the deceased" in this suit. Accordingly, Lewis-Williams must stand squarely in the shoes of Mrs. Kinney and should not have the privilege of advancing any evidence that would have been denied Mrs. Kinney. Ridgdell, 740 So. 2d at 180. Because Mrs. Kinney could have proven an absolute simulation only by producing a counterletter or answers to interrogatories, Lewis-Williams is limited to proving an absolute simulation in the same way. Notably, no evidence of a counterletter or answers to interrogatories establishing an absolute simulation is contained in the record herein. Accordingly, Lewis-Williams failed to carry her burden in proving that the July 1, 2004 act of donation was an absolute simulation, and her assertion in her second assignment of error that the donation was an absolute simulation is also without merit.[19]
We turn now to Marshall Kilroy's assertion in his fourth assignment of error that the act of donation of his mother's home in favor of her hairdresser should have been declared null on the basis of undue influence, and Lewis-Williams's contention that it should be declared null on the basis of duress. A donation inter vivos shall be declared null upon proof that it is the product of fraud, duress or undue influence. LSA-C.C. arts. 1478 & 1479. Generally, mere advice, persuasion or kindness and assistance should not constitute influence that would destroy the free agency of a donor and substitute another's volition for her own. LSA-C.C. art. 1479, Revision comment (b); Succession of Pardue, 40,177 (La. App. 2nd Cir. 11/8/05), 915 So. 2d 415, 425, writ denied, XXXX-XXXX (La. 4/28/06), 927 So. 2d 284.
A person who challenges a donation because of fraud, duress or undue influence must prove it by clear and convincing evidence. However, if, at the time the donation was made, a relationship of confidence existed between the donor and the wrongdoer and if the wrongdoer was not then related to the donor by affinity, consanguinity or adoption, the person who challenges the donation need only prove the fraud, duress or undue influence by a preponderance of the evidence.[20] LSA-C.C. art. 1483. In the instant case, it is clear that "a relationship of confidence" existed between the unrelated parties, Mrs. Kinney and Bourgeois. Thus, duress or undue influence need only be established by a preponderance of the evidence.
A review of Mrs. Kinney's mental state in the year preceding her death is necessary for a full understanding of the issue of undue influence at the time she executed the July 1, 2004 act of donation in question. It is undisputed that in August 2003, Mrs. Kinney purchased a home in Florida to be closer to her son, Marshall Kilroy, and his wife, Martha.[21] In November 2003, Marshall and Martha Kilroy assisted Mrs. Kinney in her move to Florida. Although her new home was available at that time, Mrs. Kinney moved in with Marshall and Martha Kilroy because she did not want to be alone. After staying with her son and his wife for almost one month, Mrs. Kinney moved into her new home in Florida.[22] While Mrs. Kinney was living in Florida, Martha Kilroy assisted Mrs. Kinney in all aspects of daily living, including bringing her food, washing her laundry on a daily basis, taking her to the hairdresser and taking her to visit Mr. Kinney in the nursing home.
In January 2004, while she was living in Florida, Mrs. Kinney was diagnosed with cancer. However, upon receiving this diagnosis, she refused to return to the doctor for any further testing or treatment. Soon thereafter, Mrs. Kinney began to exhibit overtly hostile behavior toward her son and his wife. Specifically, on one Sunday morning in February 2004, Marshall and Martha Kilroy offered to bring Mrs. Kinney breakfast after they attended Sunday services. However, when they arrived at her house, Mrs. Kinney was extremely angry with them, cursed Marshall and attempted to strike Martha, contending her breakfast was too late. Mrs. Kinney ordered them to get out of her house and told them that she never wanted to see them again. Mrs. Kinney then went to Baton Rouge, Louisiana about one week later, leaving Mr. Kinney in the rehabilitation nursing home in Florida until his death in March 2004.
Upon her return to Louisiana, Mrs. Kinney underwent further medical testing in March and April 2004 and was told in May 2004 that she had terminal pancreatic cancer. Also upon her return to Louisiana, Mrs. Kinney had begun looking for someone else to assist in her care for the remainder of her life given her fractured relationship with her son and his wife. Mrs. Kinney contacted Joy Kilroy, Marshall's previous wife, and requested that Joy assist in caring for her. Joy agreed, and she stayed with Mrs. Kinney for a short period of time. During the time when Joy was assisting her, Mrs. Kinney drafted a will, revoking her prior will in favor of her son and leaving her entire estate to Joy Kilroy. However, soon thereafter, Mrs. Kinney displayed more erratic behavior, in that she had some type of dispute with Joy Kilroy and began brandishing her gun around. At that point, Joy Kilroy refused to continue assisting Mrs. Kinney with her affairs.
Again being alone and in need of care and assistance, Mrs. Kinney called Bourgeois, crying, and indicated that something had happened between Joy and herself. Thus, after increasing difficulties with her family members, she asked Bourgeois if he would assist her by looking after her affairs and caring for her. This was how Mrs. Kinney's "arrangement" with Bourgeois began. According to Bourgeois, Mrs. Kinney was grateful for his help and told him that she would leave her entire estate to him.
Thus, on May 17, 2004, or approximately one month after Bourgeois started handling Mrs. Kinney's affairs, Mrs. Kinney executed a will in his favor. Bourgeois contacted attorney James Coxe, III to draft a will for Mrs. Kinney, leaving her estate to Bourgeois. Mrs. Kinney had never previously used Coxe's services, but used his services for drafting the will at Bourgeois's suggestion.
Similarly, on July 1, 2004, Mrs. Kinney executed the act of donation at issue, with Coxe also preparing this document for Mrs. Kinney's signature. Bourgeois again contacted Coxe's office and requested that the attorney initiate the preparation of the act of donation. According to Bourgeois, Mrs. Kinney donated the house to him simply because she wanted him to have it, and she wanted to make certain that no one would be able to take the house away from him after she died. He denied that he had any knowledge at that time of the $29,000.00 loan to Mrs. Kinney by Martha Kilroy or the promissory note evidencing the indebtedness.
On August 3, 2004, approximately one month after she executed the act of donation in Bourgeois's favor, Mrs. Kinney had a disagreement with or became distrustful of Bourgeois. At that time, Bourgeois stopped visiting her and assisting her with her affairs.
Thereafter, on August 12, 2004, Mrs. Kinney contacted Coxe to inquire about the possibility of selling her home, the same home she had purportedly donated to Bourgeois previously. Coxe explained to Mrs. Kinney that because she no longer owned the home, her two options were to "reverse the donation," meaning that she could have Bourgeois donate the home back to her, or have Bourgeois execute a power of attorney to allow Mrs. Kinney to sell his interest in the home.[23] When asked if he had explained to Mrs. Kinney at the time that the act of donation was executed that it was irrevocable, Coxe acknowledged that he had not. He explained that Mrs. Kinney did not ask him that and that the act of donation itself stated that it was irrevocable.
The next day, on August 13, 2004, Mrs. Kinney asked Bourgeois to return her home to her, but he refused to do so. Other than the conversation wherein she requested that he return her home to her, Bourgeois did not speak to Mrs. Kinney again.[24] As stated above, shortly thereafter, Mrs. Kinney began relying upon her neighbor, Lewis-Williams, for assistance after a chance encounter with her when Mrs. Kinney locked her sitter out of her home. Lewis-Williams then furnished Mrs. Kinney with the name of the lawyer who prepared the will in favor of Lewis-Williams and her husband, and who filed suit on Mrs. Kinney's behalf to revoke the donation to Bourgeois.
With regard to Mrs. Kinney's vulnerable mental state during the last year of her life, Martha Kilroy testified that Mrs. Kinney was having emotional problems and believed that Mr. Kinney's children were stealing from her and were trying to kill Mr. Kinney. According to Martha Kilroy, while Mrs. Kinney was staying with them in Florida, she would misplace things and think someone had taken them. She further testified that she had heard Mrs. Kinney threaten to shoot people, and she described Mrs. Kinney's behavior as "frightening." Martha Kilroy further described Mrs. Kinney as a "neurotic woman" who was "easily swayed."
Marshall Kilroy also stated that his mother had "all kinds of problems" during the last year of her life. In fact, he had filed interdiction proceedings in August 2004, because of his mother's strange behavior. He noted that he had gotten a phone call from someone at his mother's bank and was told that Mrs. Kinney was "doing strange things with her money" and was "taking money out of the bank." One of his mother's nurse's aides also called him to report his mother's bizarre behavior. According to Marshall, for months, his mother would say irrational things and was often upset. He stated that they tried to do what they could to make it easier on her, but she continued to have irrational thoughts about people stealing her mail and Mr. Kinney's children breaking into her house.
Bourgeois similarly admitted that Mrs. Kinney believed that people were breaking into her home and stealing from her and that she had mood swings. He also acknowledged that Mrs. Kinney kept a gun in her purse and another gun beside her chair and that she had threatened to shoot people.
Bourgeois further acknowledged that prior to Mrs. Kinney's request that he assist her in her final days, he had never visited her home, but rather, had only maintained a relationship with her as her hairdresser. Bourgeois was aware of the breakdown of the relationships between Mrs. Kinney and her son and between Mrs. Kinney and her former daughter-in-law, Joy Kilroy, when he became involved in her financial affairs. The record reflects that during the time that Mrs. Kinney executed the will and act of donation in his favor, Bourgeois had changed his behavior toward Mrs. Kinney, being very solicitous toward her, bringing her newspaper to her door every morning and visiting her during the evening. He also paid her bills for her and would take her out to eat.
Coxe, the attorney who drafted the act of donation in question, testified that on the day the act of donation was executed, Mrs. Kinney was jovial and declared in the presence of two witnesses that she wished to give her home to Bourgeois. Coxe did not conduct any type of formal or informal competency screening at the time Mrs. Kinney executed the act of donation. However, he stated that Mrs. Kinney was able to make decisions and express them explicitly. With regard to why she wanted to donate her house to Bourgeois at that time, Coxe acknowledged that Mrs. Kinney was clearly upset about something going on in her life at that time, but he did not inquire any further.
At the time Mrs. Kinney executed the act of donation, Coxe was not aware of the dispute with regard to the $29,000.00 promissory note. Coxe acknowledged that if he had been aware that Mrs. Kinney had just been sued, he "would have sat down and talked to her about the wisdom of that separately from the hairdresser."[25] Coxe also was not aware that approximately one month before Mrs. Kinney executed the will he prepared in favor of Bourgeois, she had executed another will in favor of someone else.
With regard to Mrs. Kinney's susceptibility to influence by others in the last months of her life, Dr. Blanche opined that Mrs. Kinney's judgment was impaired, and she was a "head strong woman who was very sensitive to manipulation by others." He further stated that Mrs. Kinney "trusted easily" the "kindness of strangers," but would also "precipitously mistrust and devalue those same persons if she felt betrayed (real or imagined)." He characterized Mrs. Kinney as a "vulnerable dying woman who was victimized by a variety of self interested persons." Dr. Blanche further opined that Bourgeois had manipulated Mrs. Kinney in this manner.[26]
The record demonstrates that Mrs. Kinney clearly felt vulnerable, feared being alone, and perceived that people were attempting to take advantage of her (which, obviously, at times was true). Thus, when anyone showed her any kindness, for whatever motivation that person may have had, Mrs. Kinney would latch onto that person and would make gifts or execute wills in that person's favor, apparently in a misguided attempt to secure that person's loyalty and support. While Bourgeois testified that his actions and kindnesses were meant simply to assist Mrs. Kinney in any way she requested, including contacting an attorney to draft the act of donation in his favor, this court is not required to view these actions in a vacuum or without regard to the evidence of Mrs. Kinney's fragile and declining mental health. Stated differently, similar assistance rendered to a donor without such predisposition could be viewed purely as helpful assistance, but Mrs. Kinney was uniquely situated and vulnerable to seemingly innocuous acts. See Succession of Lounsberry, XXXX-XXXX (La. App. 3rd Cir. 5/8/02), 824 So. 2d 409, 414, writ denied, XXXX-XXXX (La. 10/25/02), 827 So. 2d 1163.
Thus, considering the foregoing and the record as a whole, we find that the preponderance of the evidence establishes that the July 1, 2004 act of donation was the product of undue influence by Bourgeois, and, as such, it must be nullified.[27]

TRIAL COURT'S FAILURE TO RULE ON VALIDITY OF APRIL 20, 2004 AND MAY 17, 2004 WILLS (Marshall Kilroy's Assignment of Error No. 5)
In his final assignment of error, Marshall Kilroy contends that the trial court erred in failing to rule on Mrs. Kinney's capacity at the time she executed wills on April 20, 2004 and May 17, 2004. These wills were executed by Mrs. Kinney in favor of Joy Kilroy and Randy Bourgeois, respectively, prior to the will in favor of Sonya Lewis-Williams. However, no petition to probate these wills has been filed in these proceedings.[28] Indeed, Marshall Kinney seems to acknowledge that these wills were never submitted to the court for probate, but nonetheless contends in brief that the parties expanded the pleadings at trial to encompass these issues.
If the deceased is believed to have died testate, any person who considers that he has an interest in opening the succession may petition the court for the probate and execution of the testament. LSA-C.C.P. art. 2851. Moreover, if a person has possession of a document purporting to be the testament of the deceased person, even though he believes that the document is not the valid testament of the deceased, or has doubts concerning its validity, that person shall present the testament to the court with a petition praying that the document be filed in the record of the succession proceeding. LSA-C.C.P. art. 2853. Thus, presentation of a will, even though the party possessing it considers it invalid, is required by law. LSC-C.C.P. art. 2853; Succession of McLendon, 383 So. 2d 55, 58 (La. App. 2nd Cir. 1980).
In the instant case, neither the April 20, 2004 will nor the May 17, 2004 will were presented to the court for probate, nor were any pleadings filed challenging their validity. In fact, the existence of one of these wills is alluded to only in the testimony presented below and was not even offered into evidence as an exhibit. Accordingly, considering the procedural posture of this case, we find no error in the trial court's failure to rule on the validity of prior wills not properly submitted to the court for purposes of determining their validity. LSA-C.C.P. arts. 2851, 2853, 2881, 2902, 2931 & 2972. Thus, we find no merit to this assignment of error.

CONCLUSION
For the above and foregoing reasons, the portion of the October 3, 2006 judgment declaring Elizabeth Kilroy Kinney's August 25, 2004 will to be invalid due to the incompetence of Mrs. Kinney is affirmed. The portion of the October 3, 2006 judgment declaring the July 1, 2004 act of donation from Mrs. Kinney to Randy Bourgeois to be valid is reversed, and judgment is rendered declaring the July 1, 2004 act of donation invalid due to Mrs. Kinney's lack of capacity and undue influence. Costs of this appeal are assessed one-half against Sonya Lewis-Williams and one-half against Randy Bourgeois.
AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.
NOTES
[1] At the time she signed the promissory note, Mrs. Kinney was in the process of purchasing a home in Florida to be near her son, Marshall Kilroy, and his wife, Martha. While she apparently contemplated selling her home in Baton Rouge, she did not actually ever sell the home. Rather, a few months after she moved to Florida, Mrs. Kinney had a disagreement with Martha and Marshall and decided to move back to Baton Rouge. She then sold her recently purchased home in Florida.
[2] Specifically, Mrs. Kinney contended she and Bourgeois had entered into a verbal agreement wherein she agreed to donate her personal residence to Bourgeois to prevent her son from acquiring the property, but that, pursuant to the verbal agreement, Bourgeois agreed to donate the house back to Mrs. Kinney if she so requested. Mrs. Kinney further contended that she had subsequently requested that Bourgeois donate the property back to her, pursuant to their verbal agreement, but he refused.
[3] The court further found as a fact that other documents signed by Mrs. Kinney in the week before her death were invalid due to undue influence. These documents included documents creating a trust and limited liability corporation with Lewis-Williams listed as the beneficiary of the trust and the manager of the limited liability corporation. The portion of the judgment on the merits declaring these documents invalid has not been challenged by either appellant on appeal and, thus, is final.
[4] The certified medical records proffered by Marshall Kilroy that he contends were admissible and that this court concludes were erroneously excluded are proffer number one, the certified medical records of Baton Rouge Clinic; proffer number two, the certified medical records of Medical Oncology, L.L.C.; proffer number three, the certified medical records of Surgical Specialty Group, Inc.; proffer number four, the certified medical records of St. Joseph Hospice; and proffer number nine, the certified medical records of CVS pharmacy. See LSA-R.S. 13:3714(A) & LSA-R.S. 9:1299.41(A).
[5] While there is no minute entry reflecting the status conference, the parties do not dispute that it occurred on June 23, 2006.
[6] Our review of the record fails to disclose a copy of the case management schedule. However, the parties do not dispute the relevant dates contained therein.
[7] Counsel for Lewis-Williams also complained that he did not receive Marshall Kilroy's pretrial inserts, listing Dr. Blanche as a witness, until July 14, 2006, i.e. nine days after the date set forth in the case management schedule for the exchange of such documents. However, as noted by counsel for Marshall Kilroy, all parties involved in this litigation, not just counsel for Marshall Kilroy, were exchanging or changing their pretrial inserts up until the July 14, 2006 pretrial order deadline. Indeed, once the parties completed their exchange of pretrial inserts or amendments among themselves, Dr. Blanche was listed as an expert witness to be called by counsel for Marshall Kilroy in the pretrial order ultimately submitted by the parties on July 14, 2006. Because all parties were exchanging pretrial inserts in an untimely fashion and given that counsel for Lewis-Williams had previously been informed that Marshall Kilroy intended to call Dr. Blanche as his expert, we conclude this argument did not present a reasonable basis for granting the motion in limine.
[8] Our conclusion in the instant case that the trial court abused its discretion in refusing to allow the testimony of Dr. Blanche is based not only on the fact that his name was disclosed within "several days" after the June 23, 2006 status conference to counsel for Lewis-Williams, who then made no effort to depose Dr. Blanche, but also on the fact that, as discussed more fully below, the pervasive theme throughout this trial was that the trial court was hurrying matters along, at the expense of a complete development of the facts at trial.
[9] Although Marshall Kilroy prevailed on his claim to have the August 25, 2004 will nullified, which was the claim that was the most restricted in terms of time constraints, we must nonetheless determine whether Marshall Kilroy was denied a fair trial on this and all the other claims, given that this court must now conduct a de novo review, if possible, of all the issues presented.
[10] As noted above, Mrs. Kinney's death rendered the interdiction proceeding moot. Thus, this case proceeded to trial on the remaining three consolidated matters.
[11] While this matter was ultimately heard over the course of two days, we note that the minute entry for the first day of trial indicates that trial was adjourned at 2:00 p.m. that day, after four hours of testimony.
[12] Specifically, the record demonstrates that, due to time constraints, Marshall Kilroy abbreviated his questioning of James Coxe, the attorney who prepared the act of donation, and his questioning of Lewis-Williams. Also, the court limited his questioning of Ouida Calloway, Mrs. Kinney's friend of fifty years, to five minutes. Moreover, Marshall Kilroy himself was not able to testify because he simply ran out of time in the presentation of his evidence. He did offer his own deposition into evidence at the very close of the trial, as well as the deposition of his wife, Martha. However, it is unclear whether the court actually had time to review these depositions given that it ruled from the bench immediately after closing argument.

Additionally, we note that Joy Kilroy, the former wife of Marshall Kilroy, was scheduled to testify about irrational behavior of Mrs. Kinney which allegedly occurred shortly before the July 1, 2004 act of donation. However, while Marshall Kilroy informed the court that Joy Kilroy had fallen on the courthouse steps and had been taken to surgery, he did not specifically request that the court grant an extension of the time limits it had imposed to ensure that her testimony could be considered.
[13] According to the hospice records, Mrs. Kinney locked her sitter out of the house on August 6, 2004, and would not let her back in the house. The sitter then went to a neighbor's house and asked the neighbor to try to convince Mrs. Kinney to allow her back into the house. This chance encounter led to Lewis-Williams, the neighbor whose assistance the sitter requested, becoming involved in Mrs. Kinney's affairs.
[14] Dr. Cenac evaluated Mrs. Kinney a second time, on September 2, 2004, two days before her death. Dr. Cenac also opined that, on that visit, Mrs. Kinney "was competent," but that she would soon experience "gastrointestinal obstruction, stupor, and coma" and that her death was "imminent."
[15] On her initial attempt to draw the face of a clock, Mrs. Kinney clustered all of the numbers on one half of the circle, leaving the other half of the circle blank; drew the number "10" three times and the number "12" twice; and did not draw a number "11." On her second attempt, the numbers were spaced out all around the circle, but Mrs. Kinney again drew the number "10" three times. When Dr. Cenac was questioned by the court as to whether he normally administered the clock test twice, Dr. Cenac indicated that he would allow a patient to repeat the test as many times as the patient wished and that he was "not interested in failing" his patient.
[16] While Shelton Dixon, a witness to the will who did not know Mrs. Kinney and was asked to witness the will by Lewis-Williams, testified that Mrs. Kinney appeared to be "very pleasant" and did not appear to be under the influence of any medication, Ouida Calloway, Mrs. Kinney's friend of fifty years, testified similarly to Dr. Cenac regarding Mrs. Kinney's poor physical condition at the time. Specifically, she stated that she was present during Dr. Cenac's examination of Mrs. Kinney, which took place four days after the will was executed, and that, physically, Mrs. Kinney was "in very bad shape." Calloway further indicated that Mrs. Kinney was not able to answer all of the questions that Dr. Cenac asked her. She testified that when she asked counsel for Lewis-Williams, who was also present during the examination, if they could postpone the examination to another day when Mrs. Kinney may be feeling better, counsel responded that "[it] will be too late."
[17] Dr. Cenac stated that he was aware that Mrs. Kinney was taking a significant amount of pain medication, specifically morphine and other pain killers. However, he further stated that morphine does not impair cognitive capacity.
[18] Dr. Blanche did not personally interview Mrs. Kinney, because he became involved in this case after her death. Thus, he rendered a forensic psychiatric opinion.
[19] Even if we were to conclude that Lewis-Williams was able to rely upon evidence other than a counterletter or interrogatories, we note that the testimony presented does not support Lewis-Williams's assertion that Bourgeois and Mrs. Kinney had a side agreement that he would return the home to her upon her request.
[20] While testimonial or other evidence generally may not be admitted to negate or vary the contents of an authentic act, in the interest of justice, that evidence may be admitted to prove such circumstances as a vice of consent. LSA-C.C. art. 1848.
[21] This was the home purchase for which Martha Kilroy loaned Mrs. Kinney $29,000.00, which Mrs. Kinney later refused to repay.
[22] Her husband, Mr. Kinney, who had suffered a stroke prior to the move to Florida, was moved to a rehabilitation nursing home in Florida at the same time that Mrs. Kinney moved to Florida.
[23] At the time, Coxe's appreciation of the situation was that Bourgeois and Mrs. Kinney were working "hand in hand together." However, he later realized that "something was breaking down."
[24] According to Bourgeois, at the time their "arrangement" disintegrated, Mrs. Kinney had been served with the lawsuit Martha Kilroy had filed to collect on the $29,000.00 promissory note. He described her demeanor that day as "very rageful and upset." Bourgeois further testified that when he suggested to Mrs. Kinney that she just pay Martha Kilroy the money she owed, Mrs. Kinney became very upset with Bourgeois, and his involvement in her daily affairs then terminated. Notably, however, when Bourgeois was questioned in his prior deposition about why Mrs. Kinney had become angry with him, Bourgeois responded that he had no idea.
[25] The exact date that Martha Kilroy filed suit against Mrs. Kinney is not clear from the record. However, Martha Kilroy testified that about one month after the note became due on April 30, 2004, she sent Mrs. Kinney a demand letter by registered return receipt mail, but that the letter was returned to her. Thereafter, she hired an attorney, who sent Mrs. Kinney a demand letter dated June 3, 2004. When no response was forthcoming, she filed suit.
[26] We note that Dr. Cenac similarly testified that he was of the opinion that Bourgeois had exerted undue influence over Mrs. Kinney at the time of the act of donation. However, because of the credibility problems with Dr. Cenac's testimony, regarding the seeming inconsistencies between the results of his examination and his opinion regarding her capacity in the days before her death and the lack of independent corroboration of Mrs. Kimiey's assertions to him, we do not rely heavily upon his opinion with regard to this issue.
[27] Given our finding of undue influence, we need not consider whether Mrs. Kinney executed the act of donation under duress.
[28] In fact, only one of these wills is even contained in the record herein.